PHILIP P. LAIRD ᴇᴛ ᴀʟ., Cᴏɴsᴛɪᴛᴜᴛɪɴɢ ᴛʜᴇ Pᴜʙʟɪᴄ
Sᴇʀᴠɪᴄᴇ Cᴏᴍᴍɪssɪᴏɴ ᴏғ Mᴀʀʏʟᴀɴᴅ,

*vs.*

THE BALTIMORE & OHIO RAILROAD COMPANY,
ᴀ Cᴏʀᴘᴏʀᴀᴛɪᴏɴ.

*Public Service Commission: power over corporations; police
power; stock and bond issues of corporations; Balti-
more and Ohio R. R.; finances of
system; charter rights.*

The Baltimore and Ohio R. R. is subject to the jurisdiction
of the Public Service Commission in respect to those matters
which, coming under the police power of the state, have been
confided to the commission; it is also subject to the control of
the Public Service Commission in the matter of service, trans-
portation, etc., and rates, as far as concerns business conducted
within the State.                              pp. 184-185

The Public Service Commission has the right to require all
corporations conducting public utilities to lay before them the
facts relating to issues of stock and bonds or debentures or cer-
tificates of indebtedness, with statements including the amount
of such issues, and in a general way the purposes for which
such issues are to be made; and where the enterprise is one
to be conducted wholly within a single state, the commission
may sanction or disapprove of the proposition.         p. 188

But the Public Service Commission is not and can not be
invested by the legislature with supervisory powers over the ex-
penditures of money by corporations in other states, nor the
apportionment of expenditures of moneys as between different
states, nor can it pass upon, approve or condemn the wisdom
or unwisdom of construction work to be performed in other
states.                                    pp. 190-191

The final determination of matters of this nature must rest
with the officers and directors of the corporation.      p. 191

# 180    LAIRD *vs.* BALTO. & OHIO R. R. CO.

The extent of the power of the Public Service Commission in such cases is to require that there be presented to it the price at which bonds about to be issued have been agreed to be disposed of, or have been disposed of, so that the investing public may know the value that is to go into the company for the furtherance of its operation, and the bonds, which they are being asked to purchase, represent a *bona fide* transaction for which the company has received value.                    pp. 188, 191

The Public Service Commission may require the B. & O. R. R. to file applications or reports with it, stating with reasonable fullness such facts as may be required to enable the Commission, and those legitimately interested therein, to decide upon the *bona fides* of any prospective issue or sale of bonds or certificates of indebtedness and the value of the same.          p. 193

But the B. & O. R. R. is not subject to the jurisdiction of the Commission as to the financing of its whole system extending through a number of states, either in respect to determining the aggregate amount of its capital stock, or bonded indebtedness; this power having been given to the B. & O. R. R., in terms, by an amendment to its charter, Chapter 313 of the Act of 1845, and being one which the state has not the power to annul or take from.                                                  p. 188

Neither may the commission control the price at which its bonds or certificates of indebtedness shall be sold, nor why or how the moneys realized from the sale of them shall have been expended.                                            p. 193

*Decided June 25th, 1913.*

Two appeals from Circuit Court No. 2 of Baltimore City (GORTER, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Albert C. Ritchie* and *Wm. Cabell Bruce,* for the Public Service Commission, appellant.

*Hugh L. Bond* (with whom were *Herbert R. Preston* and *R. Marsden Smith* on the brief), for the Baltimore & Ohio R. R. Co., appellee.

Because of the importance and magnitude of the issues involved, the Court was requested at the argument of the above cases to announce its conclusions at as early a date as practicable, and having arrived at a determination upon the principles of law which control, the following opinion is filed:

*PER CURIAM.*

In our opinion the Baltimore and Ohio Railroad Company is subject in many respects to the jurisdiction of the Public Service Commission of Maryland as to matters done, or to be done within this State.

2d. It is proper to require the Baltimore and Ohio Railroad Company to file an application or report with the Public Service Commission, stating with reasonable fullness such facts as may be requisite to enable the Commission and those legitimately interested therein to ascertain whether any proposed issue or issues of bonds or certificates of indebtedness is or are in fact *bona fide* and for value. But beyond that it is not subject to the jurisdiction of said Commission as to the financing of the system known as the Baltimore and Ohio Railroad Company, extending through a number of States, either in respect to determining the aggregate amount of its capital stock, bonded indebtedness, the prices at which its bonds or certificates of indebtedness shall be sold, or where or how the moneys realized from the sale thereof shall be expended.

In accordance with the foregoing conclusions these cases will be remanded to the Circuit Court No. 2 of Baltimore City without either affirming or reversing the decrees appealed from, in order that the decrees entered by the said Court on the 25th day of February, 1913, and the seventh day of March, 1913, may be modified according to the terms set forth in paragraph numbered "2d;" of this *per curiam*

opinion.    The reasons for the conclusions herein contained
will be set forth in an opinion hereafter to be filed.

Filed, May 9th, 1913.

*Costs in this Court to be paid by the
Baltimore   and   Ohio   Railroad
Company; costs below to be paid
as directed by said Court.*

———————

STOCKBRIDGE, J., delivered the opinion of the Court.

Under date of January 9th, 1913, the Baltimore and Ohio
Railroad Company issued a circular letter to its stockholders.
From this it appeared that the company proposed to issue as
of March 1st, 1913, $63,250,000 gold bonds of the company,
which were to run for twenty years from their date of issue
and to bear interest at the rate of four and one-half per cent.
per annum.   The circular further stated that these bonds so
to be issued were to be convertible into common stock of the
company on the basis of $110 per share at any time prior to
February 28th, 1923, and that thereafter by giving ninety
days previous notice, the company should be entitled to
redeem the bonds on any interest date at $102\frac{1}{2}$ per cent.
While the circular letter was not explicit as to the property
which was to be pledged by way of mortgage to secure the
proposed issue, by inference it was to cover the main lines
upon which there had been issued what was termed its prior
lien mortgage, the Pittsburg Junction and Middle Division,
the Southwestern Division, the Pittsburg, Lake Erie & West
Virginia System, and all of the lines of railroad owned by
any company and the stock of which is pledged or assigned
under any of the mortgages already placed upon any of the
above named divisions.   The bonds which the company thus
proposed to issue were offered to the stockholders at $95\frac{1}{2}$ and
accrued interest.

Prior to the issue of this circular letter no application had
been made to the Public Service Commission of the State for

its order authorizing and approving of this issue. Accordingly on February 19th, 1913, the Public Service Commission of this State, acting under the provisions of section 28 of the Public Service Act (Acts 1910, Ch. 180, p. 338), filed a bill in the Circuit Court No. 2 of Baltimore City, praying for an injunction restraining the railroad company from issuing the proposed bonds, or any of them "until such time as there shall have been secured from the Public Service Commission an order authorizing such issue."

Two days after the bill was filed the railroad company answered fully, setting up the various provisions of its charter; denying that it was a corporation subject to the provisions of the Public Service Commission Act; setting out the act of the Legislature of Virginia of 1827 confirming the act of incorporation passed by the General Assembly of this State; averring that it owned and operated 281 miles of railroad in this State, 996 in the State of West Virginia, and through the other lines forming its system and extending through a number of States, a total mileage of 4450. The answer further sets out, that the issue of the bonds was necessary for the acquisition of property, the construction, completion, extension, improvement and maintenance of its facilities and its service and the discharge and lawful refunding of its obligations, that the balance of the moneys raised by the said issue of bonds, after the refunding of such obligations as were to be refunded, was to be expended largely in West Virginia. This answer was sworn to, and the case was heard in the first instance upon the bill, answer and exhibits.

The case thus presents two questions for consideration: First, whether the Baltimore and Ohio Railroad Company is subject in any respect to the jurisdiction of the Public Service Commission of Maryland; and secondly, if it is, how far does that jurisdiction extend?

It is not attempted to be denied that both before and after the passage of the Public Service Commission Act in 1910, the company was subject to the police power of the State. This might be, as was the case prior to 1910, exer-

184    LAIRD vs. BALTO. & OHIO R. R. CO.

Opinion of the Court.                        [121

cised directly by the State, and in so far as the exercise of
those powers was by the Act conferred upon the Public
Service Commission, might be exercised by it. Many of
the cases cited in the brief filed on behalf of the Commission,
and especially those from Massachusetts, illustrate this aspect
of the case. In addition to this power derived from the
police power of the State, the Commission has conferred on
it in the interest of the general public, certain other powers
in connection with the conduct of public service corporations
doing business within the State. These will be found col-
lected in section 3 of the Act, and so far as this case is
concerned, must come under one of the following enumera-
tions: "(1) To railroads and street railroads lying within this
State, and to the person or corporation, owning, leasing,
operating or controlling the same. (3) To such portions of
the lines of any other railroad as lie within this State, and
to the person or corporation owning, leasing, operating and
controlling the same, so far as concerns the construction,
maintenance, equipment, terminal facilities and local trans-
portation facilities and local transportation of persons or
property within the State. (4) To any common carrier
operating or doing business within the State." Through all
of these runs the same fundamental idea, that the power
and control of the Commission exists as to matters of service,
transportation and rates within the State, and full power
over that is expressly given to the Commission. This neces-
sarily includes many matters which are not the subject-mat-
ter of an exercise of the police power. Thus questions of
traffic or fares, or the adequacy or inadequacy of service, or
facilities with regard to business conducted wholly within
the State, may properly come within the jurisdiction of the
Commission. In this connection the three opinions by the
late CHIEF JUSTICE WAITE in the cases of the *C. B. & Q.* v.
*Iowa,* 94 U. S. 155; *Peik* v. *Chicago & N. W. R. R.,* 94 U.
S. 164, and the *C., M. & St. P.* v. *Ackley,* 94 U. S. 179, are
directly in point. In the first case the C., B. & Q. R. R. was
operating, as lessee, the Missouri River Railroad Company,

which latter was operated solely within the State of Iowa.
The Legislature of Iowa passed an Act establishing a maxi-
mum rate for railroads in that State.   The decision held that
the statute was applicable to that portion of the C., B. & Q.
R. R. located in Iowa, upon the principle enunciated in
*Munn* v. *Illinois,* which dealt with the rates to be charged
for storage of grain in a warehouse situate in Illinois.   And
it is the same doctrine which is involved in the two other
cases cited.   It, therefore, follows, that the Baltimore and
Ohio Railroad Company is subject to the jurisdiction of
the Public Service Commission of this State, both in respect
to those matters which, coming under the police power of the
State have been confided to the Commission, and to business
conducted wholly within this State.

The present bill of complaint claims for the Commission
a far wider jurisdiction.   By reason of the location of the
home office of the company in Maryland, it claims to possess
a right to control the expenditure of moneys, the creating
and issue of evidence of indebtedness, the prices at which
such bonds or debentures shall be marketed, the necessity and
expediency of the creation of the indebtedness, in general to
direct the entire physical and fiscal policy of one of the great
common carriers of this country, over its entire system of
4450 miles of railroad, of which but 281 are within this
State and 4169 located without the State, and one of which
other States, West Virginia, might with equal propriety by
reason of the confirmatory act of Virginia of 1827 and the
far greater amount of mileage in that State, make a similar
claim.   The statement of the claim, taken with the terms of
the Act of 1910 would seem to afford a conclusive answer
to the proposition.   When the Act is carefully limited by its
very terms to operations within this State, any line of reason-
ing which aims to extend it beyond, is alike in flat contra-
diction of the Act and entirely beyond the power of the
State to adopt.   The Commission makes this extraordinary
claim of power under the following provisions of Section
27 of the act:

"Sec. 27. *And be it further enacted,* That a common carrier, railroad corporation, street railroad corporation, or other corporation subject to the provisions of this Act, organized or existing, or hereafter incorporated, under and by virtue of the laws of the State of Maryland, may issue stocks, bonds, notes or other evidence of indebtedness, payable at periods of more than twelve months after the date thereof, when necessary for the acquisition of property, the construction, completion, extension or improvement of its facilities, or for the improvement or maintenance of its service, or the discharge or lawful refunding of its obligations; provided, and not otherwise, that there shall have been secured from the commission an order authorizing such issue, and the amount thereof, and stating that, in the opinion of the commission, the use of the capital to be secured by the issue of such stocks, bonds or other evidence of indebtedness is reasonably required for the said purposes of the common carrier, railroad corporation, street railroad corporation, or such corporations, but this provision shall not apply to any lawful issue of stock, to the lawful execution and delivery of any mortgage, or to the lawful issue of bonds thereunder, before the time when this Act becomes a law. For the purpose of enabling it to determine whether it should issue such an order the commission shall make such inquiry or investigation, hold such hearings, and examine such witnesses, books, papers, documents or contracts, as it may deem of importance in enabling it to reach a determination. Such common carrier may issue notes for proper corporate purposes, and not in violation of any provision of this or any other Act, payable at periods of not more than twelve months, without such consent, but no such notes shall, in whole or in part, directly or indirectly, be refunded by any issue of stock or bonds, or by any evidence of indebtedness running for more than twelve months, without the consent of the commission."

This section is almost a verbatim copy of section 55 of the similar act passed in New York, to regulate public service corporations. It was given its fullest effect and scope in the case of the *Binghampton L. H. & P. Co.* v. *Stevens,* 203 N. Y. 7, where all of the property to be affected by the proposed bond issue, and the expenditure of the money so raised, and the conduct of the business of the corporation were all within the State of New York, yet even there it was said, "the discretion of a Public Service Commission cannot override the discretion of the officers of a corporation in the management of its affairs or the provisions of the statute in which securities are permitted to be issued."

The evils which this section was intended to correct are perfectly well recognized and understood. That issues of stocks and bonds have been made fraudulently and palmed off on a credulous public to their ultimate serious loss is a matter of common knowledge. Facts in relation to such issues, especially with regard to local public utilities have been difficult, if not impossible to obtain, leaving it to the stimulated imagination of some broker or syndicate who, actuated by a heavy commission to be realized by creating a market until such stock or bonds could be unloaded, have reaped a reward in dollars and cents at the cost of those who were induced to give full faith and credit to their representations. The Legislatures of many States have therefore through the media of Public Service Commissions seen fit to establish a *quasi* guardianship over prospective investors. It is of course true that in such a condition many legitimate enterprises should come under the same sort of suspicion which attaches to the more hazardous schemes, devised and carried on for the improper enrichment of a few individuals. As a check upon such wild financing it is entirely proper, even upon the basis of the exercise of the police power to require all corporations conducting public utilities to lay before the local public service commission, the facts relating to any such issue of stocks and bonds or debentures or certificates of indebtedness,

thus placing such facts where they will be readily obtainable by any one who has an interest therein other than mere idle curiosity. Such statements as indicated in the acts passed should include the amount of the issue, in a general way the purposes for which it is desired to be made, and where the enterprise is one to be conducted wholly within a single State, it may well be, as the decisions seem to indicate, that the Commission may sanction or disapprove of the proposition.

Is now the case the same when we come to deal with an interstate carrier? It may, as laid down by CHIEF JUSTICE WAITE, be made subject to the control of each State as to matters affecting the operations of the company in such State, but beyond that, State legislation is powerless without striking at the very fundamentals of rights as recognized in our government. So far as the issue of securities is concerned the State may by virtue of its police power, require such applications, reports and statements to be filed as have a tendency to show whether the proposed issues are *bona fide* and for value, but the determination of the aggregate capitalization or bonded indebtedness, is a power which was in terms conferred on the Baltimore and Ohio Railroad by its charter, by an amendment to its charter (Chapter 313 of the Act of 1845), and which the State has not the power to detract from or annul. The rules for our guidance in thus treating the charter are fully set forth in *Baltimore* v. *B. & O. R. R.,* 6 Gill, 297, and *Baltimore* v. *B. & O. R. R.,* 21 Md. 50. For acts fraudulent in their nature the State may intervene to the same extent and no further. In this case there is no pretense that the company either perpetrated, or contemplates the commission of, a fraud. The answer of the company distinctly alleges the purposes for which the proposed issue was intended, and they are only such as are included as proper purposes by the Act. These come mainly under two heads: the refunding of outstanding obligations of the company, or the maintenance, extension or improvement of its facilities or terminals located for the most part in other States. So far as the funds to be raised by

the proposed bond issue are to be applied to the refunding of existing indebtedness now due or about to mature, the question of its extinguishment by payment or its extension by refunding is, in the absence of fraud, a matter calling peculiarly for the exercise of the discretion of the directors.   The bill of complaint neither alleges or suggests any taint of fraud, or any equitable ground, other than the phraseology of the statute, why the determination of the fiscal policy of the railroad company should be wrenched away from the officers of the company in whom it was vested by the charter, and confided to such a body as the Public Service Commission.   The case of the *D. & H. Co.* v. *Stevens,* 197 N. Y. 1, presents many points of similarity to the questions now under consideration, and in some of its aspects a far stronger case to support the jurisdiction of the Commission.   In that case it was proposed to issue bonds of a railroad company for the purpose of completion of the purchase of an electric line and of a tract of coal land, but the properties thus to be purchased were not to be included in the mortgage about to be given, to secure the proposed bond issue.   The Public Service Commissioners of New York had refused to sanction the issue, but upon appeal the rule to control in such cases was laid down as follows:

"The paramount purpose of the enactment of the Public Service Commission Law was the protection and enforcement of the rights of the public. * * * For a generation or more the public has been frequently imposed upon by the issue of stocks and bonds of public service corporations for improper purposes, without actual consideration therefor, by company officers seeking to enrich themselves to the expense of innocent and confiding investors.   One of the legislative purposes in the enactment of this statute was to correct this evil by enabling the Commission to prevent the issue of such stock and bonds, if upon an investigation of the facts it is found that they were not for the purposes of the corporations enumerated by statute and reasonably required therefor.

"We do not think the legislation alluded to was designed to make the commissioners the financial managers of the corporation, or that it empowered them to substitute their judgment for that of the board of directors or stockholders of the corporation as to the wisdom of a transaction, but that it was designed to make the commissioners the guardians of the public by enabling them to prevent the issue of stock and bonds for other than the statutory purposes. * * * If the purpose and intent of the statute was to substitute the commissioners for the directors as financial managers, a doubt might arise with reference to its constitutionality, for ordinarily the ownership of property carries with it the right of occupancy and management, and should a statute deprive the owner of the right to manage, it would, under ordinary circumstances, undermine his right to protect and make his property remunerative. *Lord* v. *Eq. Life,* 194 N. Y. 212. * * * It was evidently the legislative intent in the enactment of this provision that the commissioners should have supervision over the issuing of long-term bonds to the extent of determining whether they were issued under and in conformity with the provisions of the statute for the purposes mentioned therein, or whether they were issued for the discharge of actual and not fictitious debts of the company, or whether they were issued for the refunding of its actual obligations and not for the inflation of its stocks and bonds. Beyond this it appears to us that the powers of the commissioners do not extend."

It appears from the answer in the present case, which is supported by affidavit, that some or a considerable portion of the moneys now to be raised are to be expended beyond the limits of the State of Maryland, in the acquisition, extension, improvement or maintenance of the facilities or terminals of the railroad. Manifestly the Public Service Commission of this State is not and could not be invested by the Legislature of this State with any supervisory powers over the expenditure of moneys in other States, nor the apportionment of the expenditure of its moneys as between different

States, nor could it pass upon to approve or condemn the wisdom or unwisdom of construction work to be performed in Virginia, West Virginia, Ohio, Indiana, Illinois, Missouri, Delaware and other States. These are questions upon which the most experienced engineers frequently differ—honestly differ in their judgment. The final decision of matters of this nature must rest with the officers and directors of the corporation. Nor is there any warrant to be found in the Act for the maintenance in other States of a corps of engineers and inspectors of the Public Service Commission of Maryland, assuming, *ex gratia,* that the other States would permit it.

What has been said already applies equally well to the increase of capital stock, or the convertibility of bonds into stock upon stipulated terms and conditions, and need not be further discussed.

The same general principles apply to the price at which the securities are to be marketed. The abundance or scarcity of money in the great financial centers, a prevailing public sentiment as to business conditions, act closely akin to the law of supply and demand, in regulating the rate at which a large loan can be effected. Many elements enter into such a matter, of fluctuating importance at different times. It is a condition beyond the control of legislation. What the law-making power may do, the extent of what it can do, is to say that the Public Service Commission shall have presented to it the price at which bonds about to be issued have been agreed to be disposed of, or have been disposed of, so that the investing public may know the value that has gone into the company for the furtherance of its operations, and that the bonds which they are being asked to purchase represent a bona fide, honest transaction in which the company has received value, instead of a doubtful, diluted issue not created and put forth in good faith.

It may well be that the time will come when the jurisdiction of the Interstate Commerce Commission will be so broadened as to confer upon it a power to regulate in some

measure the fiscal management of the great interstate carriers of this country, and enable them to prevent in the future some of the ill-advised and unfortunate policies of the past. But the fact that such a power has not yet been conferred can not authorize a State to grasp a jurisdiction it was never intended it should exercise. As was well said in the *N. Y., N. H. & H. R. R.* v. *Willcox,* 200 N. Y. 431, in speaking generally of the power of Public Service Commissions:

"The commissions were given extensive powers, but they should not be extended by implication beyond what may be necessary for their just and reasonable execution. They are not without limits when directed against the management or the operations of railroads and the commissions can not enforce a provision of law unless the authority to do so can be found in the Statute."

By the decree of the Circuit Court No. 2, from which the appeal in the present case was taken, it was provided that the railroad company should file with the Public Service Commission "an application or report stating fully the facts in relation to the proposed issues of bonds and stock mentioned in the proceedings and the purposes of the same, together with such other facts as the Commission may require, so as to enable the Commission to know or ascertain whether the said issue of bonds and stock are or are not made in accordance with section 27 of the Public Service Commission Law as interpreted in said opinion herein." The form was somewhat unfortunate for the reason that it was apparently the purpose thereby to incorporate some portion or portions of the opinion in the decree, and yet what portions were not definitely indicated. For that reason in the *per curiam* opinion heretofore filled it was said:

"It is proper to require the Baltimore and Ohio Railroad Company to file an application or report with the Public Service Commission, stating with reasonable fullness such facts as may be required to enable the commission and those legitimately interested therein to ascertain whether any proposed issue or issues of bonds or certificates of indebted-

ness is or are in fact bona fide and for value; but beyond that it is not subject to the jurisdiction of said commission as to the financing of the system known as the Baltimore and Ohio Railroad Company, extending through a number of States, either in respect to determining the aggregate amount of its capital stock, bonded indebtedness, the prices at which its bonds or certificates of indebtedness shall be sold, or where or how the moneys realized from the sale thereof shall be expended."

And by the decree of this Court, filed at the same time as the *per curiam* opinion, the case was remanded for the reforming of the decree as above indicated.

> *Costs in this Court to be paid by the Baltimore &*
> *Ohio Railroad Co.; costs below to be paid as*
> *directed by said Court.*

---

PHILIP D. LAIRD ET ALS., CONSTITUTING THE PUBLIC
SERVICE COMMISSION OF MARYLAND,

*vs.*

THE BALTIMORE & OHIO RAILROAD COMPANY,
A CORPORATION,