.ALBERT G. TOWERS, E. CLAY TIMANUS and .W. LAIRD HENRY, Constituting The Public Service Commission of Maryland.

*vs.*

THE UNITED RAILWAYS AND ELECTRIC COMPANY OF BALTIMORE.

*Public Service Commission: powers of—. Railways: discretion of directors in management of—. Extension of lines to new territory.*

Where the charter of a railroad corporation simply authorizes the corporation to construct and maintain a railroad to a certain point, without requiring it to do so, the railroad company can not be compelled to complete and maintain its road to that point if it would not be remunerative.          p. 487

The Public Service Commission can exercise only such powers as the law has conferred upon it.                              p. 495

If an order complained of is not within the scope and authority conferred by law upon the commission, it is unlawful, and it is the duty of the courts, when appealed to, to restrain its enforcement.                                                p. 495

The construction, equipment and extension of railroad lines beyond the points where their charters compel them to construct and maintain lines, are matters to be determined by the directors of the company.                                    p. 496

As to such matters, the Legislature did not intend that the judgment and discretion of the directors, honestly exercised, should be controlled or ignored by the commission or by the courts.                                              p. 496

The United Railways, as the successor of the Baltimore, Gardenville and Bel Air Railroad Company, is under no obligation to extend its road from Overlea to the Little Gunpowder River.                                              p. 496

*Decided June 24th, 1915.*

Appeal from Circuit Court No. 2 of Baltimore City. (DUFFY, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Osborne I. Yellott, Asst. Genl. Counsel* (with whom was *W. Cabell Bruce* on the brief), for the appellants.

*Joseph C. France* and *Albert R. Stuart* (with whom was *J. Stanislaus Cook* on the brief), for the appellee.

BURKE, J., delivered the opinion of the Court.

The United Railways and Electric Company of Baltimore was formed March 4, 1899, by the consolidation of a number of independent street railway companies theretofore existing in Baltimore City. The Baltimore & Loreley Railway Company was incorporated by Chapter 227 of the Acts of 1894, and its name was changed to the Baltimore, Gardenville & Bel Air Electric Railway Company by Chapter 248 of the Acts of 1896. By its act of incorporation, it was "authorized and empowered to make, construct, lay down and maintain a railroad with double or single tracks, with the necessary and proper switches, turnouts, sidetracks, and any

and all mechanical devices and appliances suitable to operate an electric railway, and to run thereon cars and carriages drawn or propelled by electric or other motive power other than steam in Baltimore City and Baltimore County, beginning for the same at a point at or near the terminus of the Baltimore City Passenger Railway, at the intersection of Gay street and North avenue, in Baltimore City; thence running along the Baltimore and Jerusalem turnpike or parallel thereto, to the corporate limits of Baltimore City; thence along said pike or parallel therewith in a northeasterly direction, through Baltimore County to a point at low water mark on the Gunpowder River, in the town of Loreley, in Baltimore County, and north of the bridge of the Baltimore and Ohio Railroad, crossing said river in said county at said town; and the said railway is hereby empowered to connect with like railway or railways in Baltimore City." This railway was one of the constituent companies which entered into the consolidation by which the appellee company was created.

The Baltimore and Jerusalem Turnpike Company was incorporated by Chapter 143 of the Acts of 1867, and was authorized "to grade and make a turnpike road, beginning for the same at the limits of the City of Baltimore on the Bel Air road, and running upon and occupying the said Bel Air road from the said city to the old stage or Camp Chapel road, and from thence on said Bel Air road to the Little Gunpowder Falls, with power to diverge from the bed of said road when and where it may be desirable to said company, to use and occupy a width of thirty feet on each side from the center." The turnpike was constructed from the city limits to a village called Jerusalem in Harford County. The railway was constructed upon the turnpike under the following circumstances: By deed dated April 1st, 1895, the Turnpike Company, in consideration of five thousand dollars, granted to Simon J. Martenet, his heirs, personal representatives and assigns, subject to existing mortgages on the pike, right of way and franchises, "the right to construct

and maintain and operate an electric railway upon the turn-
pike road of the said Turnpike Company from North avenue
in Baltimore City to the end of said turnpike road, upon the
following conditions." The conditions set out in the deed—
twenty in number—related for the most part to the location,
character and construction of the railway. It was provided
that Martenet, his personal representatives and assigns,
should lay a double track along the center of said turnpike
from North avenue to a point on said turnpike, two miles
northeasterly of North avenue, at or near Gardenville, with
a flat or girder rail, and that from Gardenville, a single or
double track should be laid on the side of the turnpike. The
seventh, seventeenth and twentieth conditions are as follows:

"7th. That the said Simon J. Martenet, his per-
sonal representatives or assigns, shall within twelve
months from the first day of April, 1895, construct at
the cost and expense of the said Simon J. Martenet,
his personal representatives or assigns, four miles of
said electric railway from North Avenue in Balti-
more City northeasterly on said turnpike road, two
miles thereof to be double track, and the remainder
single or double track as hereinbefore specified."

"17th. That the said Simon J. Martenet, his per-
sonal representatives or assigns, shall begin the con-
struction of said railroad within six months from the
date of these presents, and that four miles of said
railroad shall be finished as aforesaid and in opera-
tion before the expiration of twelve months from the
first day of April, 1895."

"20th. That said railway shall be finished to the
end of said turnpike road within five years from the
date of these presents.

"Provided, That in the event of the said Simon
J. Martenet, his personal representatives or assigns,
violating any of the agreements, terms, conditions or
provisions of this agreement—that is, any of the agree-
ments, terms, conditions or provisions in these pres-
ents set forth and specified—then and in that event all
money previously paid as part of the consideration

hereof, and the franchise or right to lay tracks and to construct said railroad shall *eo instanti* become forfeited to said Turnpike Company, its successors or assigns.

"And provided also, That upon violation of any of the agreements, terms, conditions or provisions of this agreement, the said Turnpike Company, its successors or assigns, shall *eo instanti* have the right to sell and grant to any other person or corporation the said right of way and privileges to construct, maintain and operate an electric railway on said turnpike road, notwithstanding anything herein contained."

Subsequently, in May, 1895, Martenet "in consideration of his agreeing to build an electric railway on said turnpike," secured agreements from the mortgage bond holders of the turnpike to release from the operation of the mortgages all the franchises, rights of way and privileges given by the Turnpike Company to him, and also to release all the cars, poles, wires, rails and all of the property of every kind to be acquired by him or his assigns in the construction and maintenance of the railway. These agreements were reported to the Circuit Court for Baltimore County in the receivership proceedings pending against the Turnpike Company, and by an order of that Court, passed June 4, 1895, trustees were appointed with authority and direction to execute formal releases from the liens of the mortgages. By the deed referred to, Martenet secured for himself, his heirs, personal representatives and assigns, the right to build the proposed railway on the turnpike, and the obligations of himself, his personal representatives and assigns, were fixed, and by the releases mentioned his franchises and railway property, etc., were freed from the operation of the mortgages. In this way he obtained the right and clear title to build the railway from the city limits to Jerusalem, the northeasterly terminus of the turnpike, and he obligated himself and his personal representatives and assigns, to build

the road in the manner and within the time provided, and
set forth in the deed.

By deed dated July 13, 1896, Martenet granted and con-
veyed to the Baltimore, Gardenville and Bel Air Electric
Railway Company all the rights and franchises and privi-
leges conveyed and granted to him by the Turnpike Com-
pany by the deed of April 1, 1895. On September 7, 1896,
the Baltimore & Jerusalem Turnpike Company passed the
following resolution:

> "*Resolved,* That the company does hereby confirm
> to Simon J. Martenet the right to construct, main-
> tain and operate an electric railway upon the turnpike
> from North Avenue to the end thereof, and in consid-
> eration of the payments heretofore made by him, the
> said Simon J. Martenet be released from the payment
> of any further sum or sums of money other than the
> sums heretofore paid by him. And that the said
> Simon J. Martenet shall have the option of construct-
> ing said railway for the entire length of the same on
> either side of said turnpike or in the middle thereof
> by either a single or double track."

When this resolution was passed, Martenet had failed to
perform his obligations under the deed of April 1, 1895—he
had not paid the consideration expressed in the deed, and he
had not completed four miles of the road within the limit
of time specified therein; but shortly after the passage of the
resolution, the Baltimore, Gardenville and Bel Air Electric
Railway Company constructed the road to Overlea, a distance
of about three and one-half miles.

By deed dated March 4, 1899—the date of the consolida-
tion—the Baltimore, Gardenville and Bel Air Electric Rail-
way Company granted and conveyed to the United Railways
& Electric Company of Baltimore all its railways, wherever
located, and owned, acquired or operated, and which it was
authorized to build, and all its property, real, personal and
mixed, and all its entire equipment, and all its rights in
existing contracts or agreements with individuals or cor-

porations, and all the appurtenances, rights, franchises, privileges and especially the franchise to be a corporation, and all the franchises held by it, by any act, grant, or thing, or by virtue of any ordinance of the Mayor and City Council of Baltimore, or any pèrmit of the County Commissioners and any other franchises held by it in any manner whatsoever. The United Railways Company, by virtue of said consolidation and the above-mentioned deed, now owns the property and franchises, contracts and privileges mentioned and referred to in the deed from the Baltimore, Gardenville & Bel Air Electric Railway Company to it, and owns and operates its cars to a village called Overlea, in Baltimore County, about three and one-half miles beyond the northern limits of the city—its tracks and equipment being located on the Baltimore and Jerusalem Turnpike, commonly known as the Bel Air Road.

By deed dated July 13, 1906, the Turnpike Company, in consideration of sixteen hundred dollars, granted and confirmed to the United Railways Company upon the conditions expressed in the deed:

> "the right to maintain and operate its double-track electric railway upon the turnpike road of the said Turnpike Company as at present operated. And further grants unto the United Company the right to construct, operate and maintain in perpetuity a single or double track electric railway from the northern terminus of its railway as now operated upon and along the turnpike road of the said Turnpike Company, through Baltimore County to the intersection of the said turnpike road with the Big Gunpowder River, at the tract known as 'Loreley' in said county."

This deed referred to the deed of April 1, 1895, between the Turnpike Company and Martenet, and contained this recital:

> "Whereas, subsequently the Turnpike Company waived. the requirement that the said double-track electric railway should be constructed for the entire

length of the said turnpike road, and made it optional with the said Simon J. Martenet, his successors and assigns, whether or not the said railway should be constructed for the entire length of the said turnpike road."

By deed and agreement dated March 24, 1911, between Stuart Cassard, receiver of the Turnpike Company, party of the first part; the State of Maryland, acting for the State Roads Commission, of the second part; and the United Railways Company, of the third part, the bed of the turnpike from the city line to the Little Gunpowder River, a distance of about 13.8 miles, was conveyed to the State Roads Commission:

"subject, however, to any outstanding rights, easements, franchises, occupation or use of said third party, and more especially any such rights, easements, franchises, occupation or use of said The United Railways and Electric Company of Baltimore, under and by virtue of the following deeds and agreements:

"A deed and agreement dated April 1, 1895, between the Baltimore and Jerusalem Turnpike Company and Simon J. Martenet, recorded among the Land Records of Baltimore County in Liber L. M. B. No. 209, Folio 286, etc.

"A deed and agreement dated July 13th, 1896, between Simon J. Martenet and the Baltimore, Gardenville and Belair Electric Railway Company (of which the United Railways and Electric Company of Baltimore is the successor), recorded among the Land Records aforesaid in Liber L. M. B. No. 218, Folio 455, etc.

"A deed and agreement dated December 10th, 1896, between Simon J. Martenet and the Baltimore, Gardenville and Belair Electric Railway Company (of which the United Railways and Electric Company of Baltimore is the successors), recorded among the Land Records aforesaid in Liber L. M. B. No. 223, Folio 591, etc.

"A deed and agreement dated July 13th, 1906, between the Baltimore and Jerusalem Turnpike Company and the United Railways and Electric Company of Baltimore recorded among the Land Records aforesaid, in Liber W. P. C. No. 297, Folio 587, and including the right to the said The United Railways and Electric Company of Baltimore to extend its lines of railway by a single or double track to the northeasternmost end of said turnpike road, under and by virtue of said last mentioned deed and agreement upon the terms and conditions therein mentioned so far as the same do not conflict with any existing' contract or agreement between it and the State of Maryland, acting by the State Roads Commission, provided the same is exercised by said The United Railways and Electric Company of Baltimore, its successors or assigns, prior to January 1, 1934, the building and construction of an extension upon a portion or portions of said turnpike prior to January 1, 1934, to be considered as a full compliance with said agreement, as to such portion or portions of said turnpike."

The deed provided that:

"in case of extensions after the Commission shall have improved the road, the location and grades of tract shall be subject to the approval of the Commission, any disturbance of the improvements in any way shall be promptly restored by the third party at its expense, and in accordance with the specifications and to the satisfaction of the Commission."

From the aforegoing statement of facts, it appears: First, that the United Railways and Electric Company is the successors of the Baltimore, Gardenville and Bel Air Electric Railway Company, and is operating its Belair Road line (a part of its general system under a *permissive* and not a *mandatory or compulsory* charter. Second, that while the deed of April 1, 1895, between the Turnpike Company and Martenet, imposed upon him, his personal representatives and

assigns, the obligation to construct the proposed road, the entire distance or length of the turnpike, it was the intention of the Turnpike Company to relieve him from this obligation. This clearly appears by the resolution of September 7, 1896, above transcribed. This resolution expresses the intention of the Turnpike Company to change Martenet's obligation in an important particular—to relieve him from his contractual obligation to construct the proposed road the entire length of the turnpike and to convert that obligation into a *mere option* to do so. This is obvious from the language of the resolution: "That the said Simon J. Martenet shall have *the option* of constructing said railway for the entire length of the same on either side of said turnpike or in the middle thereof by either a single or double track." That the Turnpike Company intended to waive the obligation of Martenet in this respect is made more manifest by its declaration to that effect contained in its deed to the United Railways Company of July 13, 1906.

It would, therefore, seem to be clear that the appellee, as the successor of the Baltimore, Gardenville and Bel Air Electric Railway Company, is under no contractual obligation to extend its road from Overlea to the Little Gunpowder River. It has the *right* to make the extension, but is under no *contract obligation* to do so. Nor is there any absolute and imperative duty upon the Railway Company, either under its charter or arising from profession of service, to build the extension. Nor is there any unrestricted and uncontrollable power in the Public Service Commission to compel the extension. Mr. Justice Gray in *N. P. R. R. Co.* v. *Dustin,* 142 U. S. 492, said: "If the charter of a railroad corporation simply authorizes the corporation, without requiring it, to construct and maintain a railroad to a certain point, it has been held that it can not be compelled to complete and maintain its road to that point when it would not be remunerative." This principle has been adopted and applied by this Court in the two cases of the *Public Service Commission*

v. *P., B. & W. R. R. Co.*, 122 Md. 438, and *Public Service Commission* v. *Brooklyn and Curtis Bay Light and Water Company*, 122 Md. 612. The Public Service Commission in its two opinions refrained from holding that the contract of April 1, 1895, in so far as it imposed an obligation to construct the road to the northeasterly terminus of the turnpike, was now binding upon and enforceable against the appellee; but based its order upon an obligation arising under the appellee's profession and undertaking to serve the territory designed to be served, by the proposed extension, and upon its finding of fact that the extension would be remunerative to the appellee.

We now pass to a consideration of the facts and circumstances which led to the passage of the order. We here insert a diagram, taken from the appellant's brief, which shows the general situation of the territory and the principal points and objects referred to in the testimony:

In December, 1912, Garrett Brown and other residents upon or in the vicinity of the Baltimore and Jerusalem Turnpike Company, beyond the present terminus of the appellee's car line at Overlea, filed a complaint against the appellee before the Public Service Commission praying that it be compelled to extend its tracks on the turnpike from Overlea to Jerusalem, a distance of approximately $10\frac{1}{2}$ miles. An answer was filed to the petition, and a hearing was had before the Commission. The testimony taken at the hearing showed that the extension asked for would be a great benefit and convenience to the people residing in that section, and that there was a practically united and determined demand by that part of the public for the extension. Upon the question as to whether the proposed extension could be constructed and operated at a profit the evidence was most conflicting. A mass of facts, figures, suggestions, opinions, theories and data upon this question was submitted. The Commission decided that it would not grant the full relief prayed for, but would require the extension to be made to the Big Gunpowder River, and on the third of December, 1913, it passed the following order:

> "*Ordered*, That the United Rwys. and Electric Company of Baltimore be and is hereby required to extend its line of railway on the Baltimore and Jerusalem Turnpike, also known as and called Belair Road, from its present terminus at Overlea, in Baltimore County, to the south or southwest side of the Big Gunpowder River, in said county, a distance of approximately six and eight-tenths miles, the construction of such extension to be either single track or double track as said company may determine, and to have four inches of rock ballast under the ties and four-motor equipment feeder system.

> "*Ordered further,* That when said extension is completed said company shall operate thereon car service with not more than half-hourly headway, provided that a different schedule may, for sufficient cause shown, be adopted with the approval of this Commission.

"*Ordered further,* That said construction should be completed and placed in operation on or before the first day of July, in the year 1914."

On December 23, 1913, the appellee filed its bill of complaint in Circuit Court No. 2 of Baltimore City, in which it asked that the order of the Commission be vacated and set aside, and further that it be suspended until the further action of the Court. The bill, without admitting the jurisdiction of the Commission over the subject-matter of the complaint, charged that the order was unreasonable and unlawful, and that its enforcement would deprive the appellee of its property without due process of law, contrary to the provisions of the Constitution of Maryland and the fourteenth amendment of the Federal Constitution, because:

"1. The construction and operation of a road as contemplated by the order of the Commission, your orator is informed, believes and therefore avers, would involve a large expenditure of money by your orator and would be an unprofitable venture. The revenue which would be derived therefrom would not be sufficient to pay the mere cost of operation without any allowance for depreciation and interest on investment. The Public Service Commission Act did not contemplate that the directors of a corporation should no longer be permitted to exercise their judgment as to the investment of the stockholders' money, but that the Public Service Commission should exercise that function.

"2. If an electric road is to be built and operated as contemplated by the order complained of, it would be advisable for engineering and operating reasons that it should be built mainly, if not entirely, upon private rights of way and not upon the bed of the turnpike, as required by the order of the Public Service Commission.

"3. The method of construction and operation required by the order of the Commission, your orator is informed, believes and therefore avers, is not such as

would meet the reasonable requirements of efficiency and safety. The territory traversed is very hilly, and the operation of cars thereover on a single track would be of a more dangerous character than the officials of the Company feel the safety of the traveling public requires; nor do they feel that they should be ordered to operate cars for public travel over a roadway so constructed as not to afford such a degree of safety as in their opinion should be provided for the public."

It further charged that the Public Service Commission had no power under the law to require the appellee, under the facts and circumstances of the case, to construct the line from Overlea to the Big Gunpowder River. There was filed with the bill, as exhibits, a copy of the complaint of Brown and others filed with the Commission; a copy of the answer of the appellee; and a copy of the opinion and order of the Court, and a copy of the testimony taken at the hearing. The Court directed that the order of the Commission be suspended until the further action of the Court upon the filing of a bond, to be approved by the Clerk, in the sum of one thousand dollars with corporate surety, which bond was subsequently filed and approved.

The answer of the appellant to the bill of complaint, including exhibits, covers seventy-six pages of the printed record. It asserted the validity of the order, and submitted letters, resolutions, estimates and a variety of documents to support it. An examination of these exhibits shows that there is a decided difference of opinion between the residents asking for the extension and others, and the directors of the Railway Company as to the cost and proper construction of the proposed road. After the testimony of both parties had been concluded, the Court decided that the order of the Commission was unreasonable, and that the injunction should be ordered, and on June 2, 1914, JUDGE DUFFY, who heard the case in the lower Court, decreed that the testimony taken in the proceeding be remanded to the Commission, and that

further proceedings be stayed for fifteen days. A copy of the testimony was received by the Commission, and that body, after due consideration, passed the following order:

"The additional evidence taken in Circuit Court No. 2 of Baltimore City in the case of the *United Railways and Electric Company vs. Phillip D. Laird et al.,* constituting the Public Service Commission of Maryland, instituted for the purpose of having vacated and set aside the order of this Commission passed in this proceeding December 3, 1913, having been transmitted to the Public Service Commission as by section 44 of the Public Service Commission Law, provided, and being duly considered, and the Commission being of the opinion for the reasons set forth in the opinion filed contemporaneously herewith and made a part hereof that its order of December 3, 1913, should be modified:

"It is, thereupon, this twenty-fifth day of June, nineteen hundred and fourteen, by the Public Service Commission of Maryland:

"*Ordered,* 1. That said order of the Commission passed on December 3, 1913, in the above cause, be and the same is herby rescinded;

"2. That the United Railways and Electric Company of Baltimore be, and it is, hereby required to extend its line of railway on the Baltimore and Jerusalem Turnpike, also known as and called the Belair Road, from its present terminus at Overlea, in Baltimore County, to a point in said road one thousand, six hundred and forty feet to the northeast of the seven-mile stone in said county, a distance of three miles, the construction of such extension to be single track, unless the company shall elect to make the same double track, and to be constructed and equipped in such manner as said company may determine proper.

"3. That when said extension is completed said company shall operate thereon one car with such headway as the Company may determine proper under the circumstances, provided that a different schedule may,

for sufficient cause shown, be adopted with the approval of this Commission.

"4. That said construction shall be completed and said car placed in operation on or before the first day of March, 1915.

"5. That a copy of this order and of the opinion accompanying the same to be forthwith transmitted by the Secretary of this Commission to the Clerk of the Circuit Court No. 2 of Baltimore City."

After copy of this order had been filed as directed, the appellee filed a petition in the pending case praying that the order of the Commission be vacated and set aside, and that the restraining order passed as to the order of December 3, 1913, of the Public Service Commission, be made perpetual as to the order of June 25, 1914. After alleging that the order had been irregularly passed the petition charged that:

"Even if said second Order had been duly passed, it is respectfully submitted that the Commission has not, simply by reducing the length of the proposed extension from six to three miles, met the objections urged by the Company at the hearing and sustained by this Court in its said Opinion. Without recapitulating all of said objections, it is again respectfully submitted: (1) The Company is not possessed of the rights-of-way upon which to build said extension; the State Roads Commission, in improving the Belair road, has not contemplated or provided for the location of railway tracks thereon, nor would it be desirable, if feasible otherwise, to build on the turnpike. (2) Even if the Company had the necessary rights-of-way, and even if the said extension would reasonably promote the convenience of the particular residents, and even if said extension would be reasonably remunerative—nevertheless the Commission should not (if it has the power) override the discretion and decision of the Company's Board of Directors, reached after a fair and honest investigation, namely, that in view of the financial requirements, the more pressing

demands of other lines and the growing needs of its existing system as a whole, it would be injudicious and wasteful to build the extension proposed."

It further alleged that the building and operation of a single-track trolley line would be unsafe from an operative standpoint. The appellant moved that the petition be not received, but no action appears to have been taken upon this motion. Mr. Laird, the Chairman of the Commission, having resigned, and Mr. W. Laird Henry having been appointed a member of the Commission, the Court passed an order striking out the name of Mr. Laird as one of the defendants and substituted Mr. Henry as a defendant in his stead.

Thereafter the Court filed the following decree:

"This cause coming on for hearing on the order of the Public Service Commission of Maryland of December 23, 1913, as modified by the order of June 25, 1914, requiring the extension of the railway of the complainant on the Baltimore and Jerusalem turnpike a distance of approximately three miles; and the Court being of the opinion that said modified order is unreasonable within the meaning of section 44 of the Public Service Commission Act; it is thereupon, this third day of February, 1915, by the Circuit Court No. 2 of Baltimore City:

"*Adjudged, Ordered and Decreed,* That Albert G. Towers, E. Clay Timanus and W. Laird Henry, constituting the Public Service Commission of Maryland, be and they are hereby perpetually enjoined from enforcing their order of June 25, 1914, requiring the extension of the complainant's railway as aforesaid."

The appeal now before us was taken by the Public Service Commission from that decree.

It must be borne in mind that the order under consideration does not relate to *existing* equipment, appliances or service in the territory mentioned. It relates to an extension of

the appellee's service into a territory which it never in fact served and which it determined not to serve because it would be unprofitable to do so. It is well settled that the Public Service Commission can exercise only such powers as the law has conferred upon it. If an order complained of is not within the scope of the authority conferred by law upon the Commission, it is unlawful, and it is the duty of the Court, when applied to, to restrain its enforcement. The important question in this case is not whether the convenience of that section of the county requires the construction of the extension, or whether the people of that territory demand that the line be built. If this were the only question involved the case would be free from difficulty, for the evidence makes it perfectly plain that the extension of the line is greatly needed and that there is an urgent public demand that it be made. The primary and controlling question, which it is our duty to decide is this: Had the Public Service Commission the *power* to pass the order?

It is apparent from an examination of the record that the construction and equipment of this extension in the way the Directors of the Company, in the exercise of their honest judgment, considered that it should be constructed or equipped and operated, would result in an annual loss to the Company. That such would be the case can not be doubted, and is not denied by the appellant. What the Commission has done, and what it intended to do, is to order the construction of a "jerk-water" line equipped with one car only, from Overlea to the point indicated in the order. This they did against the judgment of the Directors of the appellee Company. If the conclusion of the Commission as to questions of fact be accepted as sound, this was the only possible construction and equipment that could have been ordered that would have shown any profit at all. In the judgment of the Company this kind of a road is highly undesirable from a business, engineering and operating standpoint, and the construction of such a road is disapproved of by its Directors. The manner of construction, equipment and operation of

such an extension are, in our opinion, matters to be determined by the Directors of the Company. As to such matters, the Legislature did not intend that the judgment and discretion of the Directors of the Company, when honestly exercised, should be controlled or ignored either by the Public Service Commission or the Courts. The Company submitted to the Court abundant evidence to show why they regard this "jerk-water" line as an unprofitable and unbusiness-like undertaking.

In overruling their judgment and requiring this extension to be made upon the terms specified in the order the Public Service Commission substituted its judgment for that of the Directors of the appellee Company. This, under the principles announced by this Court in *Laird* v. *B. & O. R. R. Co.,* 121 Md. 179; *Pa. R. R. Co.* v. *Towers et al.,* 126 Md. 59, it had no power to do.

It was earnestly contended on behalf of the appellee that the Public Service Commission had no power to compel the extension of its lines into new and untried territory, but it is unnecessary to determine that question in this case, or to determine the question as to the unreasonableness of the order, as we are of opinion that the Commission exceeded its power in passing the order of June 25, 1914, and for that reason the decree appealed from will be affirmed.

*Decree affirmed, with costs.*