(No. 13196.—Judgment reversed.)
THE MISSOURI PACIFIC RAILROAD COMPANY, Appellant, *vs.*
THE PUBLIC UTILITIES COMMISSION, Appellee.

*Opinion filed April 21, 1920.*

1. PUBLIC UTILITIES—*statute authorizing charge for bond-issue certificate is void as to foreign railroad corporations.* Section 31 of the Public Utilities act, authorizing the commission to charge every public utility receiving permission under the act. to issue bonds or other evidences of indebtedness a fee of one-tenth of one per cent of the total issue of the bonds, is void when applied to a foreign railroad corporation issuing bonds secured by a mortgage on its entire system, as such a charge imposes a burden on interstate commerce.

2. SAME—*article 3 of Public Utilities act applies to issue of securities and not to their sale.* Article 3 of the Public Utilities act, prohibiting the issue of bonds of indebtedness without the authority of the commission, applies to the issue of such securities and not to their sale.

APPEAL from the Circuit Court of Sangamon county; the Hon. E. S. SMITH, Judge, presiding.

L. O. WHITNEL, and GEORGE B. GILLESPIE, (GEO. B. & GEO. M. GILLESPIE, and WHITNEL & WHITNEL, of counsel,) for appellant.

EDWARD J. BRUNDAGE, Attorney General, WILLIAM E. TRAUTMANN, ALBERT D. RODENBERG, and RAYMOND S. PRUITT, for appellee.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

This appeal questions the validity of a charge made by the Public Utilities Commission against the Missouri Pacific Railroad Company for a certificate authorizing the issue of $6,200,000 first and refunding mortgage six per cent gold bonds secured by a mortgage of the whole line of appellant. Article 3 of the Public Utilities act (Hurd's Stat.

1917, p. 2288 *et seq.*) prohibits the issue of such bonds without the authority of the commission, imposes severe penalties for such issue and purports to invalidate bonds so issued. Section 31 of the act provides that "the commission shall charge every public utility receiving permission under this act for the issue of bonds, notes and other evidences of indebtedness, an amount equal to ten cents for every hundred dollars of such securities authorized by the commission, and the same shall be paid into the State treasury before any such securities shall be issued." Appellant applied in this State, and in other States through which its lines passed, for a certificate authorizing the issue of said bonds. The commission granted the authority and charged a fee of $6200. The company accepted the grant of authority as required by its terms and paid the fee under protest. It appealed from the decision of the commission to the circuit court of Sangamon county, seeking to have the charge made by the commission set aside on the ground that the imposition and collection of a fee equal to ten cents on each $100 of the bonds authorized to be issued and made a lien on property located in foreign States is the taking of property without due process of law and a denial of the equal protection of the law, in violation of the fourteenth amendment to the Federal constitution, and, furthermore, that it is an imposition of an unreasonable burden upon interstate commerce, in violation of the constitutional authority vested in Congress to regulate commerce among the several States. From the judgment of the circuit court confirming the decision of the commission this appeal was prayed and perfected.

The Missouri Pacific Railroad Company is a Missouri corporation operating 6785.37 miles of its own lines and 322.98 miles of leased lines. One hundred and ninety-four miles of its own lines and 46.33 miles of its leased lines are in Illinois. Its lines extend through nine States, more than three-fourths of the mileage being in Missouri, Kan-

sas and Arkansas. The total value of the appellant's property is more than $383,000,000, of which approximately $11,000,000 is in Illinois. The bonds were to be issued to reimburse the company for expenditures made and to be made for construction, extension and improvements of its facilities. The business done by the company in this State is both intrastate and interstate.

Section 31 above referred to clearly provides that the charge be fixed by percentage on the total issue contemplated. The issue was a lien on the whole system of appellant, which extends through nine States. On principles now well established, we are therefore compelled to conclude that these fees, when applied to a foreign railroad corporation like appellant entering this State to engage in interstate commerce, impose an unconstitutional burden upon interstate commerce.

Probably the leading case on this subject is *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1, 30 Sup. Ct. 190. There a statute of Kansas was in question. As construed by the State court that statute required the telegraph company, a New York corporation doing an interstate and intrastate business, to pay a license fee of a given per cent of its authorized capital, representing all of its business and property, both within and outside the State, for the privilege of conducting a local business in the State. In deciding that the Kansas statute was invalid for the reason that it was repugnant to the commerce clause of the constitution and the due process clause of the fourteenth amendment, the Supreme Court of the United States referred to a number of its previous decisions in which various statutes had been declared to impose a burden upon interstate commerce and after reviewing these decisions at length said, among other things: "The authorities cited show that this court has guarded with both diligence and firmness the freedom of interstate commerce against hostile State or local action, as such action has been manifested by regulations

operating, in some instances, directly, in others indirectly, upon the means or instruments employed in that commerce. This has been done without violating the principle that an interstate carrier entering a State for purposes of its business is subject to local regulations that in their essence and purpose only incidentally affect interstate commerce but are established in good faith for the protection, safety, comfort and convenience of the people, are not in themselves in any real, just sense an obstruction to or in conflict with the substantial rights of those engaged in interstate commerce but are referable to the police powers of the State and to be respected until Congress covers the subject by legislation. [Citing authorities.] We are aware of no decision by this court holding that a State may, by any device or in any way, whether by a license tax in the form of a 'fee' or otherwise, burden the interstate business of a corporation of another State, although the State may tax the corporation's property regularly or permanently located within its limits, where the ascertainment of the amount assessed is made 'dependent, in fact, on the value of its property situated within the State.' [Citing authorities.] On the contrary, it is to be deduced from the adjudged cases that a corporation of one State authorized by its charter to engage in lawful commerce among the States may not be prevented by another State from coming into its limits for all the legitimate purposes of such commerce. It may go into the State without obtaining a license from it for the purposes of its interstate business and without liability to taxation there on account of such business. But it is said that none of the authorities cited are pertinent to the present case because the State expressly disclaims any purpose by the statute in question to obstruct or embarrass interstate commerce but seeks only to prevent the telegraph company from entering the field of domestic business in Kansas without its consent and without conforming to the requirements of its statute. But the disavowal by the State

of any purpose to burden interstate commerce cannot conclude the question as to the fact of such a burden being imposed or as to the unconstitutionality of the statute, as shown by its necessary operation upon interstate commerce. If the statute, reasonably interpreted, either directly or by its necessary operation burdens interstate commerce it must be adjudged to be invalid, whatever may have been the purpose for which it was enacted and although the company may do both interstate and local business. This court has repeatedly adjudged that in all such matters the judiciary will not regard mere forms but will look through forms to the substance of things. Such is an established rule of constitutional construction, as the adjudged cases abundantly show. [Citing and discussing authorities.] Looking, then, at the natural and reasonable effect of the statute, disregarding mere forms of expression, it is clear that the making of the payment by the telegraph company, as a charter fee, of a given per cent of its authorized capital, representing, as that capital clearly does, all of its business and property, both within and outside of the State, a condition of its right to do local business in Kansas, is in its essence not simply a tax for the privilege of doing local business in the State, but a burden and tax on the company's interstate business and on its property located or used outside of the State. The express words of the statute leave no doubt as to what is the basis on which the fee specified in the State statute rests. That fee, plainly, is not based on such of the company's capital stock as represented in its local business and property in Kansas. The requirement is a given per cent of the company's authorized capital,—that is, all its capital, wherever or however employed, whether in the United States or in foreign countries, and whatever may be the extent of its lines in Kansas as compared with its lines outside of that State. What part of the fee exacted is to be attributed to the company's domestic business in Kansas and what part to interstate business the State has not chosen

to ascertain and declare in the statute. It strikes at the company's entire business wherever conducted and its property wherever located, and in terms makes it a condition of the company's telegraph right to transact purely local business in Kansas that it shall contribute for the benefit of the State school fund a given per cent of its whole authorized capital, representing all of its property and all its business and interests everywhere. * * * We repeat, that the statutory requirement that the telegraph company shall, as a condition of its right to engage in local business in Kansas, first pay into the State school fund a given per cent of its authorized capital, representing all its business and property everywhere, is a burden on the company's interstate commerce and its privilege to engage in that commerce, in that it makes both such commerce as conducted by the company and its property outside of the State contribute to the support of the State's schools. Such is the necessary effect of the statute, and that result cannot be avoided or concealed by calling the exaction of such a per cent of its capital stock a 'fee' for the privilege of doing local business. To hold otherwise is to allow form to control substance. It is easy to be seen that if every State should pass a statute similar to that enacted by Kansas, not only the freedom of interstate commerce would be destroyed, the decisions of this court nullified and the business of the country thrown into confusion, but each State would continue to meet its own local expenses not only by exactions that directly burden such commerce but by taxation upon property situated beyond its limits."

From the reasoning of this authority we think it settled that Illinois cannot constitutionally collect from a railroad corporation of another State a fee of one-tenth of one per cent of the amount of its total issue of bonds secured by a mortgage of its entire system, practically all of which is located outside the State of Illinois, as a condition precedent to the granting of a certificate authorizing the issuance

of these securities. *Laird* v. *Baltimore and Ohio Railroad Co.* 121 Md. 179, 88 Atl. 348; *Looney* v. *Crane Co.* 245 U. S. 178, 38 Sup. Ct. 85; *International Paper Co.* v. *Massachusetts,* 246 U. S. 135, 38 Sup. Ct. 292; *Union Pacific Railroad Co.* v. *Public Service Com.* 248 U. S. 67, 39 Sup. Ct. 24.

The decision last cited concerned a situation where the facts were substantially the same as in this case and involved the construction of a Missouri statute very similar to the statute here under consideration, and we consider the holding of the Supreme Court in that case to be controlling here. In construing the same statute the Supreme Court of Missouri in *Public Service Com.* v. *Union Pacific Railroad Co.* 197 S. W. 39, said: "Section 54 (Laws of 1913, p. 592,) declares, in substance, that a corporate franchise, viz., the power to issue stocks and bonds or to create liens on their property situated in this State, 'is a special privilege granted certain corporations,' 'the control of which is vested in the State' and shall be exercised 'as provided by law' and the rules prescribed by the commission. In thus declaring itself to be 'vested' with the control of the 'special privilege' inhering in the charters of certain corporations the State necessarily referred to those charters lying within its own grant, or, in other words, to domestic corporations. Any other construction of the terms of this statute would involve the illogical consequence that a foreign corporation could not 'issue stocks,' etc., authorized by its charter, upon the assumption that its power to do so is a 'special privilege,' the right to control which 'is and shall continue to be vested' in the State of Missouri. This assumption is, however, impossible, for the reason that the entire authority of a foreign corporation to issue shares of stock grows out of and is limited by the terms of the charter granted to it by the State where it is created. It necessarily results that the right to issue such stocks is not a 'special privilege' given by the State of Missouri.

292 — 28

Demonstrably, therefore, the legislature could not have intended, by making that privilege the basis of the right to State control, to embrace corporations other than those who obtain such privilege from this State. It follows, upon the hypothesis of section 54, *supra,* that the provisions therein have no application to the respondent, which acquired no charter rights nor special privilege from the State of Missouri at any time." Section 54 above referred to is almost an exact duplicate of section 20 of the Public Utilities act of this State. We consider the reasoning of the Supreme Court of Missouri sound and supported by the great weight of authority.

The evils which this section was apparently intended to correct are perfectly well recognized and understood. That issues of stocks and bonds have been made fraudulently and palmed off on a credulous public to their ultimate serious loss is a matter of common knowledge. Such evils, however, must be regulated by the so-called "Blue Sky" laws. The decisions sustaining Blue Sky laws cannot, however, furnish any authority for sustaining the decision in this case, because the supervision, regulation, restriction and control imposed by article 3 of the Public Utilities act are directed not to the sale of securities within this State but to the issuance of securities,—corporate acts which corporations can only consummate in the States where they are organized and domiciled. Section 31 of the Public Utilities act is void when applied to a foreign corporation.

The judgment of the circuit court of Sangamon county is reversed and that part of the decision of the Public Utilities Commission assessing a charge of $6200 against appellant is set aside.                    *Judgment reversed.*