# THE HAVRE DE GRACE & PERRYVILLE BRIDGE COMPANY, a Corporation,

## *vs.*

# ALBERT G. TOWERS, E. CLAY TIMANUS and PHILIP D. LAIRD, Constituting the Public Service Commission of Maryland.

*Public Service Commission: powers of—; accounts of corporations; fixing rates; legislative function; review by courts; Havre de Grace Bridge Co.*

Extensive as are the powers conferred upon the Public Service Commission by the Act creating it, that Act does not take away from corporations subject thereto their power of control upon questions of financial policy. p. 22

On an appeal from the order of the Public Service Commission fixing the tolls for the Havre de Grace Bridge Company, it was: *Held,* that that portion of the order which required the Bridge Company to set up and maintain a depreciation reserve account and deposit to the credit of it a fixed annual amount was without warrant of law and void. p. 23

The power of the Commission to direct how accounts for such companies should be kept does not include the power to prescribe a fixed sum to be charged or credited a particular account annually. p. 23

The power of the Public Service Commission to fix reasonable rates is legislative; the functions of a court in reviewing the actions of the Commission are distinctly judicial, and are to be exercised only for the purpose of determining whether such action of the Commission is unreasonable or unlawful. p. 24

The burden of proof in such cases is imposed upon the parties adverse to the Commission to show by clear and satisfactory evidence that the determination, requirements, direction or order of the Commission complained of are unreasonable or unlawful.                                    pp. 24-25

Upon an application to the court for an injunction restraining the execution of an order of the Commission, the court has no authority to determine what would be a reasonable rate for the services required, or to establish rates, but its power is limited to the determination of the question whether the rates fixed by the Commission are unreasonable and unlawful, and until it is made to appear by clear and satisfactory evidence that the action of the Commission is unreasonable or unlawful, the Court is without power to impose any restriction upon the execution of the Commission's order.                                    p. 25

In determining what should be the charges for the Havre de Grace Bridge Company, and in assessing the value of the bridge for such a purpose, it was: *Held,* that the real point to be ascertained was, not what it had cost either the Railroad Company to build the bridge or the incorporators of the Bridge Company to acquire it, but what was its fair value at the time of the investigation by the Commission.                                    p. 27

In making the allowance for the maintenance and upkeep of the Havre de Grace Bridge, it was: *Held,* that the action taken by the Commission was unreasonable or in contradiction of its own estimate of expenses.                                    pp. 30-32

On appeal from the order of the Public Service Commission fixing the rates to be charged for the use of the Havre de Grace Bridge, it was: *Held,* that the rates promulgated by such order were unreasonable and unfair.                                    p. 33

*Decided January 15th, 1918.*

Appeal from Circuit Court No. 2 of Baltimore City. (BOND, J.)

The facts are stated in the opinion of the Court.

18 HAVRE DE GRACE BRIDGE CO. vs. P. S. COM.

Opinion of the Court.                    [132

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.

W. Calvin Chesnut and Thomas H. Robinson, for the appellant.

Osborne I. Yellott, Assistant Counsel to Public Service Commission, and W. Cabell Bruce, General Counsel to Public Service Commission, for the appellees.

STOCKBRIDGE, J., delivered the opinion of the Court.

There is presented by the record in this case a question of ratemaking by the Public Service Commission of a somewhat unusual nature, and with regard to which no conclusion is entirely satisfactory.

The rates involved are those to be charged the users of a toll bridge across the Susquehanna River from Havre de Grace, in Harford County, to Perryville, in Cecil County, in this State. The length of the bridge is 3,240 feet, in the neighborhood of three-fifths of a mile.

The power of the Public Service Commission to regulate such rates of toll is derived from the provisions of an Act of Assembly (1916, Chapter 272), by which certain bridges which were authorized by their charters to collect toll were classified as common carriers and made subject to the provisions of law relating to such corporations, and to the same extent, under the provisions and control of the Public Service Commission. There are, therefore, no new principles involved in this case, but there is considerable difficulty in the application of those principles to the facts.

A very concise statement of the more salient points out of which the case arises will help to clarify the issue, and probably facilitate arriving at a correct conclusion.

A little over forty years ago the P., W. & B. R. R. Co. constructed a single-track railroad bridge across the Susquehanna River, for the passage of its trains between the points

HAVRE DE GRACE BRIDGE CO. vs. P. S. COM. 19

Md.]                          Opinion of the Court.

of Havre de Grace and Perryville. The bridge was the type then in vogue, namely, of wooden-truss construction, supported by a series of piers built up from the bed of the river. Some years later, in order to give greater stability to the structure, the wooden trusses were replaced by wrought-iron ones, and the bridge continued to be used by the P., W. & B. R. R. and its successor, the P., B. & W. R. R. Co., as a railroad bridge down to about ten years ago.

At that time this bridge, which had been originally built at a cost in excess of $2,000,000, was found to be inadequate to the needs of the railroad company, both by reason of the fact that it was a single-track bridge only and that, with the growth of travel, the greater weight of the locomotives and freight continually passing over it brought a strain upon the construction of the bridge greater than it had been designed to carry when it was originally built. Assent was thereupon obtained from the Legislature of the State and the War Department for the construction of a double-track railroad bridge, paralleling at a distance of about 150 feet the bridge theretofore used. The grant of the right to construct a new bridge was coupled with a requirement for the removal of the earlier bridge.

There was at that time no highway bridge crossing the Susquehanna River at this point, nor at any point nearer than Conowingo, some ten or twelve miles further up the river, and it was felt that it would be a great advantage to persons residing in Havre de Grace and Perryville, when the original bridge should be abandoned as a railroad bridge to have it converted into a highway bridge.

An endeavor was made to interest both county and municipal authorities on each side of the river to undertake the conversion and maintenance of the bridge, which they declined to do, apparently because apprehensive that the revenues which would be derived from tolls would be inadequate, both to effect the necessary adaptation of the railroad

bridge for use as a highway bridge and the upkeep of it after it had been so adapted.

In this condition, a charter was granted by the Legislature to certain gentlemen resident in Harford and Cecil Counties creating a bridge company, authorizing the acquisition by the company of the bridge, and its administration, with the right to charge tolls for the use thereof, conditioned only that the rates of toll should not be in excess of those charged by the company owning and operating the Conowingo Bridge and which was a much shorter structure.

The seven gentlemen named in the charter effected a corporate organization, each subscribing and paying for one share of stock of the par value of $100, and after negotiating with the railroad company, the railroad company, at a cost of $89,000 adapted the bridge for use as a highway bridge, and turned the same over to the bridge corporation, which thereupon issued its stock to the several incorporators in an aggregate amount of $50,000.

The bridge company expended a small sum of money, approximately $1,700, in the erection of toll houses, bridge approaches and some other items, none of which were very large in amount. It also established rates of toll for the various classes of traffic over the bridge, from foot passengers to motor trucks, and at rates less than those in force at the Conowingo Bridge, which by its charter were the maximum the new bridge company was authorized to charge.

For the first two years after the structure had been thrown open to travel as a highway bridge the revenues were inconsiderable, the gross revenue being from six to seven thousand dollars per annum. Two factors then combined to cause thereafter a great increase in the gross revenue of the bridge, amounting for the year 1916 to somewhere between $58,000 and $60,000. These two factors were the sudden development and use, for both pleasure and business, of automobiles, the tolls from which constituted about 90 per cent. of the gross revenues of the bridge, and, second, the gross receipts

were augmented to a considerable degree by the development of the state system of good roads, which brought this bridge directly upon the line of travel from Baltimore to Philadelphia and points north.

It was this sudden increase in revenue, entirely unforeseen at the time that the bridge company was formed, which seems to have suggested to certain persons, residents of Harford and Cecil Counties, that the rates of toll which were charged were excessive, and called for an investigation of the bridge company by the Public Service Commission, and a reduction of the rates of toll.

This litigation is the outgrowth of that investigation which resulted in a reduction of the rates of toll to be charged, for the period of five years from October, 1916, of fully one-half, the idea of the Commission being that it had reduced the income of the company about 48 per cent., while the company's contention is that the reduction amounts to 72 per cent. Upon the entry of the Commission's order making the reduction, application was made to the Circuit Court No. 2 of Baltimore City to declare the action of the Commission void, as being unlawful, unreasonable and confiscatory. That Court, after full hearing and with a large amount of expert testimony before it, dismissed the bill of the bridge company, and it is from that action that this appeal has been taken.

At the threshold of this case is the consideration whether the order of the Commission comes within the scope of the powers granted to it by the Legislature, or whether it exceeds those powers, and for that reason is null and void.

So far as the power to fix rates is concerned, there can be no question, under the language of the Act, that such power was granted to the Commission. The order as made by the Commission goes further than this, and requires the bridge company to establish and maintain a "main depreciation reserve account," and annually to make a deposit of a specified sum to the credit of such account, which fund is required

to "be deposited in some safe depository paying not less than 3 per cent. per annum, compounded not less than annually, or by said directors invested in some safe investment paying an equal or higher rate of interest, the investment in either event to be subject to the prior approval of the Commission."

In corporations which have a bonded indebtedness it is frequently a stipulation of the contract that a similar course shall be followed, the fund so to be accumulated being ordinarily called a sinking fund, but that is a matter arising out of contract stipulations or agreement, not because of any mandate of public authority. Other corporations maintain under various designations reserve accounts, created by the corporation as a matter of corporate policy merely. With the wisdom of the creation and maintenance of such reserve there is no concern in this case. The bridge company has no bonded indebtedness. The only question is, is the Commission invested by the Legislature with the power to direct and control the financial policy of this company?

The same question was presented to this Court in *Laird* v. *B. & O. R. R. Co.*, 121 Md. 179, and it was there held that extensive as were the powers granted to the Commission, they did not take away from the corporation its power of control upon a question of financial policy. The same question was raised in *Binghampton L. H. & P. Co.* v. *Stevens,* 203 N. Y. 7, where the grant of power to the Public Service Commission was very similar to that contained in our Act of 1910 (Ch. 180), and the Court in that case said: "The discretion of a Public Service Commission can not override the discretion of the officers of a corporation in the management of its affairs."

In the earlier case of the *D. & H. Co.* v. *Stevens,* 197 N. Y. 1, the Court had said: "We do not think the legislation alluded to was designed to make the commissioners the financial managers of the corporation, or that it empowered them

to substitute their judgment for that of the directors or stockholders of the corporation."

In *P. S. C.* v. *Un. Ry. & El. Co.,* 126 Md. 495, this Court, speaking through JUDGE BURKE, says: "If an order complained of is not within the scope of the authority conferred by law upon the Commission, it is unlawful, and it is the duty of the Court, when applied to, to restrain its enforcement."

That portion of the order of the Commission, therefore, which required the Bridge Company to set up and maintain a main depreciation reserve account, and deposit to the credit of it a fixed annual amount, was clearly without warrant of law, and void.

The Commission was given the power to direct how the accounts of the company should be kept, but such power does not include the power to prescribe a fixed sum to be charged or credited to a particular account annually. That is either a subject of contract or a matter of the fiscal policy of the company.

While the order is silent upon the question of the payment of certain salaries, it is clear from the opinion filed by the Public Service Commission, and upon which its order is based, that the Commission intended in effect to limit the amount of salaries to be paid to certain officials of the Bridge Company. It is true that the opinion does not say that these officers shall not receive any greater compensation than that referred to in the opinion, but intimates that if a higher compensation is paid to them, it can not be regarded as a proper charge against the receipts of the Bridge Company, but should be paid apparently by the individual stockholders. Inasmuch as the services for which the salaries are paid are to be rendered to the corporation, as a corporation, it is hard to understand why the salaries for the performance of the services should not be paid by the corporation. Indirectly, of course, the question of salaries enters into the question of rate making, since the larger the aggregate amount of salaries

paid, the less will be the net revenue derived from tolls, applicable to dividends for the stockholders. Therefore, in this regard the Public Service Commission by its order undertook by indirection to direct the financial management of the company.

It is not intended in what has been said to intimate that under no circumstances have the Public Service Commission the right to treat an allowance of salary as an improper charge by the corporation; undoubtedly where there has been a flagrant abuse of such power the Public Service Commission may intervene, but the record in this case is entirely devoid of anything to show that the power of the directors to fix the salaries of the officers of the company has been in any way abused. In this regard, therefore, the effect of the order of the Commission is undoubtedly to interfere with the financial management of the company, and what was said with regard to the main depreciation reserve account, is equally applicable here.

The next question which presents itself is as to the scope and nature of the power of the Court in dealing with cases of this character. There have been numerous decisions with regard to this, but nowhere is the proper rule of law better or more clearly stated than in the *Public Service Commission* v. *No. Cent. Ry. Co.,* 122 Md. 388. In a very comprehensive and painstaking opinion prepared by Judge Thomas, this aspect was disposed of as follows: "The power of the Commission to fix reasonable rates is legislative, the functions of the Court in reviewing the actions of the Commission are distinctly judicial and are exercised only for the purpose of determining whether such action of the Commission is unreasonable or unlawful."

Under section 460, Code Art. 23, the burden of proof is imposed upon the parties adverse to the Commission to show by (quoting from the same opinion), "clear and satisfactory evidence that the determination, requirements, direction or order of the Commission complained of is unreasonable or

unlawful as the case may be.   Upon an application to the Court for an injunction restraining the execution of an order of the Commission, the Court has no authority to determine what would be a reasonable rate for the service required, or to establish rates, but its power is limited to the determination of the question whether the rates fixed by the Commission are unreasonable or unlawful, and until it is made to appear by clear and satisfactory evidence that the action of the Commission is unreasonable or unlawful, the Court is without power to impose any restriction upon the execution of the Commission's order."   There remains but the single question, whether the rates fixed by the Commission have been shown to be unreasonable.

The original petitioners to the Commission seem to have proceeded on the theory that as the bridge cost the incorporators but a very small sum, and as its receipts had been more than sufficient to defray the operating expenses, and repay the original outlay, that because it was a public highway, they were entitled to have the use of it for merely a nominal sum.   The statement of so extreme a proposition is a sufficient refutation, and was so regarded by the Commission.

A different view was that held by Lord Chancellor Selbourne in *Canada Southern R. R.* v. *Int. Bridge Co.*, L. R. A. App. Cas. 723, where he took the ground that for the establishment of a rate the proper measure was the value of the service rendered to the individual who might avail himself of it.   While to some extent this is true, unqualified assent can not be given to it, because the value of the service, though identical in character, may be far greater to one individual than to another.

There have been many cases dealing with the reasonableness of rates, and that is the vital question in this case.   In these various cases a few have attempted to lay down a rule of what was, and what was not, a reasonable rate, but all such cases are in some respects unsatisfactory, because, as

was well said in *Kennebec Water District* v. *Waterville,* 97 Maine, 185: "The conditions surrounding properties are so variant that it is difficult, and in some particulars impossible, to lay down rules of value which will apply to all cases without modification." See also *Ames* v. *Un. Pac. Ry.,* 64 Fed. 178.

There were one or two matters insisted upon at the argument which can readily be disposed of. Thus, the counsel for the Public Service Commission urged strongly that the great increase in the revenues of the bridge was to be attributed to the construction of a state highway leading directly thereto. This argument is simply making use of a portion of a circle, for while it is undoubtedly true that the construction of the state highway has contributed materially to promote travel across the bridge, and so increase the tolls collected by the company, it is also true that but for the bridge the state highway would in all probability have been differently located, so as not to come to a dead end when the river was reached. Both the bridge and the highway have been separate factors operating concurrently to a single end, and it is impossible to ascribe a preponderance in favor of either. The one acts as an offset of the other.

Both in the argument and in the brief filed on behalf of the Public Service Commission there was used, probably by inadvertence, an expression calculated to mislead, namely, the value of the property of the bridge company *for rate making purposes.* The provision for the valuation of the property of a corporation, subject to the Public Service Law, is found in the Code in Article 23, section 442, where the Commission is empowered to "ascertain the fair value of the property of any corporation subject to the provisions of this sub-title." That, and that only, is the valuation which the Public Service Commission is authorized to ascertain, and it would tend not only to work an injustice, but to render absurd a proposition that the property of a public service corporation might have one value in fact, another for pur-

poses of rate making, and a third for purposes of taxation, in the absence of statutory provision such as obtains in some states, that for taxation purposes property is to be assessed at only a given percentage of its real value. What the Commission in this case was authorized to ascertain under the section referred to was the *fair value* of the property.

In the rate making cases reported, different starting points have been taken, and the weight accorded to the several factors which enter into such a question have varied greatly. In some that which had most weight with the Commission was the question of the net earnings of the corporation, but "the fact that the net earnings of the carrier may be large does not of itself justify us in fixing a rate at less than is reasonable for the service, all other things being considered." *R. R. Commissioners* v. *Ill. Cent. R. R.,* 20 I. C. C. 181.

This suggests a question, does the reasonableness of valuation depend on the income derived, or the reasonableness of the rate depend on the valuation fixed? The only case which has attempted to give a direct answer upon this point is the *Kennebec Water District* v. *Waterville, supra,* and is to the effect that the reasonableness of the rates is dependent upon the value of the property.

No direct parallel can be drawn between a private corporation and a public service corporation, for the reason that to a greater or less extent the public has acquired an interest in the use of the property devoted to public use, and, correlatively, the company owes a duty to the public as well as to its stockholders, and must charge no more than a reasonable rate for the services rendered.

In reaching this, there are many factors to be considered. A partial enumeration of these would include the value of the property employed, the value of the service rendered to the user, whether or not the corporation enjoyed a monopoly, the rate of return which should be made to the stockholders after the payment of operating expenses, upkeep and fixed charges, a reasonable allowance for depreciation, whether or

not the utility is in operation or *in fieri,* the risk incurred by those who began the undertaking, and others which may arise out of the peculiar nature of the utility which is being operated.

Among the last named, a most important factor in the present case, is the probable aggregate amount of tolls to be collected over the series of years for which the order provides. These are admittedly speculative to a very large degree. The bridge company argues that instead of any increase an actual diminution must be anticipated, because of the State's acquisition of the Conowingo Bridge, making it a free bridge, with the roads leading to it on both sides of the river part of a system of good roads, already completed or nearing completion. The theory of the Public Service Commission, on the other hand, is for an increase year by year in the revenue of the bridge, in a decreasing amount, and is referred to by the counsel for the Commission as "extremely conservative." No figures were presented before the Commission by which the correctness of these estimates, one way or the other, could be tested.

At the time when the case was heard the road on the Cecil County side of the Susquehanna, leading to the Conowingo Bridge, had not been converted into what is generally described as a good road, nor with this handicap had that bridge been thrown open to the public free of toll for any sufficient length of time to afford even a basis for calculation.

In undertaking the work of the valuation of this bridge the Commission proceeded about as follows: it had its own regular engineer estimate the cost of the reproduction of the bridge, and in the course of the testimony before the Court another engineer, Mr. Shirley, was called upon the same point. The Commission had determined naturally and properly to reject the valuation of the bridge simply upon the basis of what it had cost the incorporators. This would have been as far afield as it would have been to have taken

the cost of the bridge to the P., W. & B. R. R. at the time of the original construction. The real point to be ascertained was not what it had cost either the railroad company to build the bridge, or the incorporators of the Bridge Company to acquire it, but what was its fair value at the time of the investigation by the Commission. In a number of cases recourse has been had to this line of inquiry for a similar purpose, but the value testified to of such a structure is only one of the factors to which consideration must needs be given in such a proceeding, and the reproduction value is liable to be increased from other considerations, and diminished by various allowances.

Experts were likewise called on behalf of the Bridge Company, and the variation between the experts was very great, ranging from a little over $300,000 by Mr. Phelps, the engineer of the Commission, to more than $600,000 by Mr. Stuart; and while these were spoken of as re-production costs, they were not such strictly, for the reason that both of the gentlemen estimated upon the basis of replacing the existing structure with one where the metal to be used was steel, and not wrought iron. The big difference between the engineers who were figuring on reproduction costs, is to be found in the estimated cost of certain materials and labor, Mr. Phelps taking an average cost before the great increase in prices of materials had taken place, and Mr. Stuart using the figures as they are at the present time. Neither of these represented normal conditions and, therefore, neither was entirely fair or just.

Without stopping to discuss what in our opinion would have been a fair, just and reasonable figure to have adopted as the reproduction cost, what we do find is this: the estimate of Mr. Phelps of the reproduction cost was a little over $300,000; to this the Commission made certain additions of factors not taken into account, or for which no allowance had been made by Mr. Phelps in his estimate, bringing up the value of the property as of the time of the Commission's investigation, to $350,000.

The next step was marshalling the items to be deducted from this estimated fair value of the bridge. In these were included depreciation, fixed charges and items of that general description.

The first of these to be considered was the question of taxation. That item the Commission placed at $500 per annum, through each of the five years during which their order was to operate. This allowance was made upon the basis of an exemption from county and municipal taxation contained in the charter of the Bridge Company. Without discussing whether such exemption was valid or invalid, the fact remains that the property was not exempt from State taxation, to cover which even the amount allowed by the Commission of $500 per annum, for the years 1916, 1917, 1918, 1919 and 1920 was, in view of the increases which have been taking place in the State taxation, manifestly an inadequate allowance. If now to this be added the amount of the taxes for which the Bridge Company will be liable upon its property or income to the Federal Government, the inadequacy becomes all the more apparent, and since the amount payable in the way of taxes is a deduction from the gross income, in order to determine the net income distributable among the stockholders, the effect is inevitably to reduce by some fraction the amount of such net revenue.

As already noted, the theory of the Commission was that there would be a constantly increasing gross revenue derived from the use of the bridge during the ensuing five years. That meant that there would be each year a larger use of the bridge, and a greater wear upon certain portions of it; yet the amount allowed for repairs, $5,523, was the same through each one of the five years covered by the Commission's order. While the increase, if any, may not be great, it only needs to be stated to be apparent, that the item of repairs is bound to increase from the greater use of that which is the subject of the use and, therefore, that in the making of this allowance as constant, the action of the

Commission was either unreasonable or a contradiction of its own estimate of increased user.

So too the estimated allowance for wages, gas and oil, and coal was fixed at a constant sum, in entire disregard of the well-known fact of the upward trend of the increased cost of all of these items for a number of years past.

This brings us to the curious result that the Commission, while estimating that the revenues of the Bridge Company would increase over $30,000 during the five-year period which its order covers, its estimated allowance for all operating expenses and taxes remain constant.

In an earlier part of this opinion attention was called to the attempt on the part of the Commission to require the establishment of a main depreciation reserve account, and the deposit of a specified amount annually to the credit of such account. While the act which created and defined the powers of the Commission authorized it to direct the mode of keeping accounts, so that the Commission and the public might at all times be able to ascertain what the real condition of the company was financially, the order of the Commission expressly provided that it was to be reserved by the company "for the purpose of making extraordinary repairs, structural changes or replacement of its bridge property when and as required." There was nothing in this which would enable any judgments recovered against the company to be paid from this reserve account, and the order of the Commission said, that "nothing herein contained shall be taken as in any way prohibiting the respondent company from setting up on its books any other or additional reserve accounts, the maintenance of which may be reasonably necessary for the proper conduct of its corporate affairs."

In determining the value of the bridge there was allowed to be retained for legal expenses, only the sum of $1,000 per annum, in the face of the fact that there were pending at the time suits against the Bridge Company, in which the aggregate amounts claimed were $30,000. From this it follows that for estimating the net revenue of the company,

although there were possible liabilities then the subject of litigation, amounting to $30,000 the company was required to retain as a reserve only $1,000 per annum from its gross revenues, in reaching an ascertainment of the net revenues of the company, yet the return to the stockholders was necessarily dependent upon the amount of the net revenues of the corporation.

The effect of these various items under the opinion of the Commission was, therefore, to increase as far as possible the net revenue of the corporation, and then establish rates of tolls based on a net revenue so estimated to be obtained.

No item of depreciation, as such, appears in the tabulation, though it is probably intended to be covered under the so-called "main depreciation reserve." This was based not upon any direct ascertainment of actual deterioration in the bridge structure, but upon the basis of the estimated future life of the bridge. It is difficult to characterize this by any other term than guess work. The engineers gave the estimate of the probable duration of such a bridge from the time of its construction. This was followed up by an estimated duration of the bridge in the condition in which it was at the time when the valuation was made, and which if correct would show a far longer period of durability than would have been anticipated at the time when first constructed. This is a factor which under the circumstances of this case is in the highest degree speculative and impossible to measure in terms of dollars and cents, as the Commission undertook to do.

Then super-added to all of the considerations thus far noted, was the following: "We have given consideration to the circumstances therein set up and have construed them as creating substantial equities in the public with respect to the rates of toll proper to be charged over the bridge in question." Just what these supposed *substantial equities* were, the opinion of the Commission throws no light upon, but having them in mind, and after the deductions already mentioned, an allowance, and apparently a *substantial allow-*

*ance,* was made for these equities, with the result that the
value of the bridge was decreased $100,000, and its value
fixed at $250,000, and the tolls attempted to be adjusted so
as to yield to the stockholders of the Bridge Company a
proper return upon such valuation.

By a similar process of reasoning it would have been
entirely possible to have reached any valuation which might
have been desired. This is not intended as in any way
reflecting upon the *bona fides* of the intent of those constitut-
ing the Public Service Commission, either in fixing the fair
value of the bridge, or the rates promulgated by the Com-
mission's order; but it is important as showing that the
method adopted and result obtained was unreasonable.

It is not the function of this Court either to fix the valu-
ation of the property, or the reasonableness of the rates.
Its sole power and duty is to examine those rates in the
light of the method by which they were obtained, and say,
whether in our judgment the same were reasonable or unrea-
sonable, and after careful consideration we are bound to hold
the action of the Commission unreasonable, and the decree
appealed from must, therefore, be reversed.

> *Decree reversed and cause remanded to the
> Circuit Court No. 2 of Baltimore City to
> the end that the order of said Commission
> may be vacated and set aside, and the case
> remanded to the Public Service Commis-
> sion; the costs of this case to be equally
> divided between the parties to this cause.*