## SCHROEDER v. ANNAPOLIS & CHESAPEAKE BAY POWER CO.

### No. 1827.

District Court, D. Maryland.

Feb. 2, 1933.

Hershey, Donaldson, Williams & Stanley (by Raymond S. Williams), of Baltimore, Md., for plaintiff.

Janney, Ober & Williams (by Stuart S. Janney), of Baltimore, Md., for receiver of Annapolis & Chesapeake Bay Power Co.

Marbury, Gosnell & Williams (by George Weems Williams and William L. Marbury, Jr.), of Baltimore, Md., for receiver of Washington, B. & A. R. Co.

Cook & Markell (by Charles Markell), of Baltimore, Md., for Consolidated Gas, Electric Light & Power Co.

Bartlett, Poe & Claggett (by Edgar Allan Poe and Edgar Allan Poe, Jr.), of Baltimore, Md., for Protective Committee, Wilson and others.

Venable, Baetjer & Howard (by Joseph France), of Baltimore, Md., for Alexander Brown & Sons.

Semmes, Bowen & Semmes (by Jesse N. Bowen and Richard F. Cleveland), of Baltimore, Md., on behalf of Cleveland Trust Co., trustee.

## WILLIAM C. COLEMAN, District Judge.

The question presented for determination is whether this court should ratify the sale to the Consolidated Gas, Electric Light & Power Company of Baltimore of all of the property and franchises of the Annapolis & Chesapeake Bay Power Company, at the price which the former company (hereinafter called the Gas Company) bid for the property, namely, $1,900,000, subject to the lien of first mortgage bonds and assumed obligations aggregating $1,473,102.12, or a total purchase price of $3,373,102.12.

The Annapolis & Chesapeake Bay Power Company (which we will hereafter refer to as the Power Company) has been in the hands of a receiver, appointed by this court, since January 27, 1931. All of the outstanding capital stock of the power company, namely, 39,721 shares, without par value, is owned by the Washington, Baltimore & Annapolis Electric Railway Company, a majority of whose oustanding stock, both common and preferred, is in turn owned by the Baltimore Corporation of Maryland, and all of the latter's outstanding capital stock is owned by the Gas Company. As a result of this interrelationship, simultaneously with the filing in this court of a bill for the appointment of a receiver for the Railway Company, namely, in January, 1931 (which appointment was forthwith made), that company being insolvent both in the sense that it was unable to pay its debts as they became due, and in the sense that the amount of its indebtedness exceeded the value of its property, a bill for a receiver for the Power Company was also filed in this court by an unsecured creditor, in the nature of a friendly suit, to which the Power Company consented, and a receiver was appointed; the court feeling this to be necessary under the circumstances to avoid possible execution sales, etc. Although the value of the Power Company's property and franchises was in excess of the amount of its outstanding bonds and other indebtedness, and its income was in excess of its current operating expenses and current interest on its indebtedness, it was unable to pay the principal of its unfunded indebtedness, and under existing conditions, it was not feasible to effect permanent financing of that indebtedness. These conditions have persisted for the past two years, the Railroad Company also still being in receivership.

The Power Company's bonded indebtedness is as follows: of an authorized issue not exceeding $5,000,000 of first mortgage bonds, $1,428,600 are outstanding—$687,100 Series A, 6 per cent. bonds; $246,500 Series B, 5½ per cent. bonds, $65,000 of which are pledged to secure the Gas Company on loans made to the Power Company on its demand notes, hereinafter referred to; and $495,000 Series C, 5½ per cent. bonds, which are also pledged in the same manner. In September, 1930, the Gas Company lent the Power Company for capital expenditures for construction $1,657,000 on nineteen demand notes, partially secured by bonds as above explained, with interest at 5 per cent. until some twelve months ago, when the rate was increased to 6 per cent., and the amount of the matured, unpaid interest, as of December 31, 1932, was approximately $150,000. None of the principal has been paid. The Power Company was also indebted to the Gas Company on open account for some $47,000. Standing in this creditor position, the Gas Company petitioned the court on June 22, 1932, for the sale of the Power Company's entire property. Over the objection of bondholders of the Railroad Company, the trustee for these bondholders, and also of the receiver of the Railroad Company, the court ordered the sale, at which the aforementioned price was offered, to be held on the 30th day of September, 1932, at Annapolis, after publication, through the local press, of the time, place, and terms of the sale, at intervals over a period of some thirty days, and after similar notice had been broadly circularized, and also advertised in leading financial journals and newspapers in New York City. The formalities of the sale have been fully complied with by the receiver and the Gas Company. There were no other bidders, and the receiver thereupon accepted the aforementioned bid of the Gas Company, subject to ratification by this court, and further the receiver has recommended that the sale be ratified. Thereupon, this court, on the 3rd day of October, 1932, passed an order directing all interested par-

ties to show cause, on or before a specified date, why the sale to the Gas Company should not be finally ratified and confirmed; this order being published at intervals of several weeks in the local daily press. As a result of this order, exceptions having been filed to the ratification by the same parties that had objected to the sale, the matter was set down for hearing on the 2nd day of December, 1932, when extensive testimony was heard, arguments were presented, and the matter was taken under advisement.

This sale was preceded by another attempt to dispose of the entire property of the Power Company, pursuant to an order of this court passed on the 27th day of May, 1932, directing that the same be offered for public sale, as a result of another petition of the Gas Company similar to the later one which is the subject of this proceeding. The terms of this first sale, however, provided that the receiver should entertain no bid of less than $3,750,000 gross, that is, no bid of less than $2,294,900, subject to then existing liens amounting to $1,428,600, arising out of the same obligations hereinbefore mentioned. This upset price was decreed by the court as a result of several hearings had upon the Gas Company's petition for sale, at which exhaustive arguments were heard both pro and con, on behalf of the various interested parties, and also as a result of a study made by the court of various appraisal figures submitted to it, including an appraisal authorized by the court, made by the Stone & Webster Engineering Corporation. While more detailed reference will be later made to certain features of these appraisals, suffice it to say at this point that the present value placed upon the Power Company's property by the Stone & Webster Corporation was approximately $4,000,000.

Upon the date set for this first sale with the upset price limitation, namely, July 15, 1932, after the same extensive publication and circularization of the time, place, and terms of the sale as preceded the later offering, no bid was received. Because of this fact, and because the Gas Company felt aggrieved at the limitation imposed upon the bidding at the first sale, it very shortly, that is, on July 22, 1932, petitioned the court for a resale of the property as has been explained, resulting in the Gas Company's offer for the property received at the second public sale held on September 30, 1932. So much for an outline of the entire proceedings up to the present time. Next as to the character, extent, and earning capacity of the Power Company's property.

The Power Company serves electricity to an extensive rural and semi-rural territory which may be described roughly as lying for the most part south of Baltimore and between the District of Columbia and Chesapeake Bay, extending into five Maryland counties— Anne Arundel, Prince George's, Howard, Montgomery, and Calvert. The company also distributes gas in the city of Annapolis and the immediately adjacent territory. The total area served is 607 square miles, embracing a total population of approximately 60,-000. Except for Annapolis, with a population of approximately 13,000 people, the company serves no other towns of any size, and there are practically no industrial plants within the territory. Farming, and governmental activities at Annapolis and at Camp Meade, form the chief sources of income in this territory. In recent years, there has been a considerable increase in the territory's population due primarily to the increase in summer homes along the Bay front, this development having progressed to a point beyond which growth is not likely to be so great in the future. The Power Company has no electric generating station, but buys all its power from the Gas Company. Prior to 1931, it also had a power contract with the Washington, Baltimore & Annapolis Electric Railway Company, the parent corporation, but this contract was terminated since the receivership. The Power Company has two gas plants at Annapolis, one of which, a coal gas plant, has not been in operation for some four years and is of little if any value; the other, a water gas plant, is in serviceable condition. The company's property generally has been well maintained and is now in good condition. Many of the electrical extensions are new. The territory served is well covered with transmission and distribution lines, and the service, both actual and potential, is adequate for any probable needs. There are approximately 12,000 electric meters now in service, which indicates, in relation to a total population of 60,000, that the number of customers is not likely to show any great increase. The average annual residential consumption of electricity compares favorably with the average annual consumption throughout the country for residential customers, and the average yearly bill is slightly in excess of the corresponding average bill throughout the country. The territory served by the Power Company is surrounded by territory served by three other power companies; on the north, by the Gas Company, on the east and south, by the Potomac Electric Power Company, and further to the south,

by the Maryland Light & Power Company. Some of the latter's rates in adjacent territory are considerably higher, while, generally speaking, the rates of the two other power companies named are lower than the rates of the company with which we are here concerned. It appears to be generally conceded that as a result of these inequalities, the Public Service Commission of Maryland will, in the near future, require certain reductions in existing rates of the Power Company; an investigation into its entire rate structure having already been initiated.

Without going into the question of the reasonableness of the cost to the Power Company of purchasing its power and gas supply from third parties, or into a detailed consideration of the ratio of operating expenses to gross-earnings or other related ratios, suffice it to say, for the purposes of our immediate inquiry, that the earnings of the company have shown, for the past several years, an excellent rate of growth. For the calendar year 1927, its net operating revenue (before deducting fixed charges) was $160,763; whereas, in 1931, it had increased to $229,465. This growth has been maintained. For example, the net operating revenue for 1931 was $229,000, and $213,000 for the first nine months of 1932. After deducting fixed charges, it was $108,000 for 1931, and $102,-000 for the first nine months of 1932. Since the receivership began, $144,000 has been put back into the property from earnings.

On the aforegoing state of facts, we now reach the precise question presented for determination, namely, should the price which the Gas Company has offered for the Power Company be approved, and the sale ratified? At the very outset of any approach to this question, we, of course, recognize the long-settled rule that a judicial sale will not be set aside for inadequacy of price, unless the inadequacy be so great as to shock the conscience, or raise a presumption of fraud or mistake, or unless there be additional circumstances against its fairness. Graffam v. Burgess, 117 U. S. 180, 6 S. Ct. 686, 29 L. Ed. 839; Pewabic Mining Co. v. Mason, 145 U. S. 349, 12 S. Ct. 887, 36 L. Ed. 732; Ballentyne v. Smith, 205 U. S. 285, 27 S. Ct. 527, 51 L. Ed. 803; Speers Sand & Clay Works v. American Trust Co. (C. C. A.) 52 F.(2d) 831. We must, therefore, determine, first, whether there is any abnormal inadequacy of price, and, second, whether even though there may not be, there nevertheless may exist additional circumstances indicating that it is an unfair price. At this point it is proper to summarize the arguments advanced both by those excepting to the ratification and by the Gas Company, the purchaser.

The opponents of ratification representing, directly or indirectly, the owners of some $10,000,000 of bonds of the Railroad Company and subsidiaries, argue that the Gas Company is not a creditor in the conventional or usual sense; that its large advances were but steps in furtherance of its purpose ultimately to acquire the Power Company. They claim, therefore, that the Gas Company seeks, not to collect a debt, but to complete its purpose by forfeiting the interest of its co-owners at a time of great economic depression when this can be accomplished at an abnormally low price. They further argue that no company would conceivably advance to another company in which it is interested such large amounts, merely on demand notes, except as a step in the acquisition of property and as a means of acquiring it at a bargain. They stress the fact that prior to 1928, the Gas Company, through a subsidiary, had acquired 54 per cent. of both the preferred and common stocks of the Washington, Baltimore & Annapolis Railroad Company, primarily for the purpose of acquiring control of the Power Company; that following such control, the Power Company entered upon a very substantial program of expansion, until in June, 1930, it had apparently reached a point where its earnings did not permit the issue of additional bonds for capital expenditures; that instead of financing this expansion through stock, or abandoning the program as prudence might have dictated, the Power Company, at the instance of the Gas Company, was required to proceed and to borrow large sums from the latter. Thus, argue the opponents of ratification, refusal to order immediate sale is fully justified in the exercise of the court's discretion, in the face of these exceptional facts and the present abnormal economic conditions. It is asserted that the assets and franchises of the Power Company have a value which greatly exceeds its debts, and it is pointed out that its earnings, which have been steadily increasing, and its working capital, are now greater than at the time of the Gas Company's advances; that if a sale must take place at the present time, a fair value (excluding any capitalization of the advantages and profits to be derived by the purchaser, because of the strategic location of the Power Company and the sale to it of gas, electricity, etc.) would be at least $4,-000,000, a price which cannot be realized by a sale at the present time; and that, therefore, to allow the Gas Company to acquire the

property at the bid price, means an unwarranted sacrifice of the stockholders' equity.

■ In reaching a conclusion, we cannot, of course, lose sight of the fact that we are not dealing with an execution sale or a sale on foreclosure, but with a sale in a receivership proceeding; that the primary object of the receivership is to protect all interests, not merely to enforce the rights of one or of a few; and that to this extent, at least, the method of approach differs from that with respect to execution and foreclosure sales. And yet, there is the further basic rule that must govern receiverships, namely, that a court of equity should not prolong the receivership operation of a company of this kind beyond the time when its assets and business can, for fair value, be either completely liquidated to the best interest of lienholders and other creditors, or disposed of at its fair value as a going concern. As was said by the Supreme Court in Re Metropolitan Railway Receivership, 208 U. S. 90, 111, 112, 28 S. Ct. 219, 225, 52 L. Ed. 403, respecting a railroad which is equally applicable to a power company: "A court is a very unsatisfactory body to administer the affairs of a railroad as a going concern, and we feel that the possession of such property by the court through its receivers should not be unnecessarily prolonged," and that orders in such a receivership ought "to bring about the earliest possible resumption of normal conditions when those who may be the owners of the property shall be in possession of and operate it." See, also, Kingsport Press v. Brief English Systems (C. C. A.) 54 F.(2d) 497, 501, certiorari denied Owen v. Kingsport Press, Inc., 286 U. S. 545, 52 S. Ct. 497, 76 L. Ed. 1282.

On behalf of the Gas Company it is argued that in the light of the legal principles which have just been referred to, there can be no discretion in the court to do otherwise than ratify the sale, and it is asserted further that the price represents the full pre-depression, normal market value of the property—greater than (1) the present depressed market value, and than (2) present depressed prices at a forced sale. It is claimed by the Gas Company that in effect what the debtor interests are seeking is a moratorium of indefinite duration.

In order to determine which contention is sound, we turn to a consideration of the evidence respecting the fair value of the property, which discloses figures bearing upon three different, well-recognized rules for the ascertainment of fair value of property of this kind: (1) Original cost; (2) cost of reproduction, less depreciation (including going value); (3) capitalization of earnings.

First, as to original cost, the undisputed figure, less depreciation, is $2,971,823. Second, under cost of reproduction, less depreciation, we have two sets of figures: One the result of the appraisal made at the request of the objecting bondholders of the Washington, Baltimore & Annapolis Railroad Company, with the consent and approval of the court, by the Stone & Webster Corporation; the other, the figures submitted by the Gas Company. The first are on the basis of spot prices as of January 31, 1932, less depreciation, including recognized overhead expenses, one item of which is 10 per cent. for going value. These figures result in a value of $2,806,000. The other figures submitted by the Gas Company are on the basis of so-called "pre-crash" prices (1925–1929, inclusive) and yield a figure of $3,365,218.

The prima facie inconclusiveness of the first set of figures lies in the fact that they are based upon prices admittedly abnormally low. On the other hand, average cost figures over any given period are not conclusive, because there is no criterion for accepting any specific period or any given number of years. Statistics, however, do show that prices sooner or later tend to stabilize themselves over rather extended periods, as evidenced by the price levels between 1923 and 1927. Therefore, it is believed that the better criterion is to be found in the second, that is, the Gas Company's, set of figures which produce a value of $3,365,218.

Coming to the second method placed in evidence for determining the fair value of the property, namely, capitalization of earnings, we again have two different sets of figures submitted under the same general rule of computation: First, the Stone & Webster Corporation figures, and, second, the figures submitted on behalf of the Gas Company. Under the first, a value of approximately $4,000,000 is arrived at as follows: Net revenue for twelve months ending January 31, 1932, was $253,058, which, after deducting interest charges of $138,339, leaves an equity of $114,719. This is then capitalized at 8 per cent. or multiplied by 12½ per cent., representing the ratio of the average net earnings to the average market price of outstanding stocks of corresponding public utility companies in the country, over the past ten years. The result is $1,433,987, which, plus the outstanding bonds and notes in the amount of $2,583,600, produces the figure of approxi-

mately $4,000,000, above referred to. The Gas Company's computation under the same general rule, treating, however, the Gas Company's loan of $1,687,000 as part of the equity, produces a figure of, roughly, $3,400,-000, instead of $4,000,000.

The obvious weakness in any plan which bases a determination of value upon capitalization of earnings is that it is based upon rates which themselves are subject to regulation on the basis of value. The present rates of the Power Company in all likelihood will be reduced, regardless of the ownership of the property, for reasons heretofore given. Reduction of rates to the basis of the Gas Company's present rural rates might entirely destroy the margin of earnings over and above interest on existing indebtedness. Therefore, we are disposed to reject this method of ascertaining fair value as being too speculative. As the Gas Company contends, this proceeding is not restricted to value for rate-making purposes, although a property of this kind may be said to have one value in fact, another for purposes of rate making, a third for purposes of taxation, and so on, because public utilities do not change hands often enough to fix dependable market values. See Minnesota Rate Case, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Havre De Grace Bridge Co. v. Public Service Comm., 132 Md. 16, 103 A. 319; Miles v. Public Service Comm., 151 Md. 337, 135 A. 579, 49 A. L. R. 1470. Other so-called guides for determining fair value have been submitted, but a passing word with respect to them would seem to be sufficient to disclose their inadequacy as a proper guide here. For example, ratio of plant account to the market value of securities is advanced. But the fallacy in this proposal lies in the difficulty in obtaining a multiplier which will fairly reflect the status of any particular company. That is to say, there can be no fixed rule. Securities are presumed to be purchased on a value of other than mere plant value, namely, upon reliance upon financial structure, management, prospects for future development, and earnings, etc.—a variety of elements, all of which vary in any given case. It is true, one of the proper guides in ascertaining value is market value of the stocks and bonds of the company whose property is being valued, not of other companies. But in the present case, this becomes at once an unsatisfactory guide, with the stock of the company unmarketable.

After a full consideration of all of the aforegoing figures, the court reaches the conclusion: First, that the fairest, and indeed the only proper, method of determining the present value of the property, is on the basis of the cost of reproduction, less depreciation, using, not spot prices, but prices such as the Gas Company has adopted, namely, those prevailing for a reasonable period prior to the present depression. We believe this method to be consonant with rules for valuation laid down by the Supreme Court. See Omaha v. Omaha Water Co., 218 U. S. 180, 202–203, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084; also National Waterworks Company v. Kansas City (C. C. A.) 62 F. 853, 864–866, 27 L. R. A. 827; Temmer v. Denver Tramway Co. (C. C. A.) 18 F. (2d) 226, 228–229. Second, we conclude that the price bid for the property is not inadequate since it is slightly in excess of the highest "pre-crash" normal reproduction cost. In so deciding, we are not unmindful of the fact that an upset price of $3,750,000 was stipulated for the first sale of the property, and also that since that time, the depression has increased rather than decreased in severity, but meanwhile the court has had the benefit of a considerable amount of additional detailed testimony, and, further, has had more ample opportunity to consider all of the surrounding circumstances which must necessarily be taken into account in a proposed sale of this character. In other words, the court believes that the factors in favor of disposing of the property at this time, even in the face of admittedly most abnormal conditions, for the price now obtainable, outweigh the factors in favor of further delay. Indeed, the court is influenced to a very large extent by the belief, which is inevitable, that, assuming the universal hope will be realized and conditions will, in the not too distant future, swing back to at least a more normal trend, this will in no sense guarantee the production of any additional bidders for the property, or higher bids if new bidders do appear. The strategic position of the Gas Company, the inherent character of this particular utility, necessarily indicate that the market for it is distinctly limited. In short, we are facing a condition and not a theory. The Gas Company for years has maintained, and still maintains, a dominant position with respect to this property and in the absence of some fraud or collusion, either in connection with the heavy advances which it has made to the Power Company or in connection with the steps which have led up to the receivership and the sale or both, it is difficult to find any sound reason on which to question the Gas

Company's right at this time to acquire the property. It should not be penalized merely for having made the property, through its management and advancing large sums for improvements, more valuable. As was said in Chesapeake & Potomac Tel. Co. v. Whitman (D. C.) 3 F.(2d) 938, at 941: "In the nature of things, there can be seldom anything like a free market for a public utility. Except in the case of some comparatively small properties, possible purchasers are few, and probable ones perhaps nonexistent. This was true, even before the days of public regulation and limitation of rates."

A decree will be signed in accordance with this opinion.